[Civ. No. 25938. Second Dist., Div. Three. Dec. 21, 1962.]

R. E. ROBISON, Plaintiff and Respondent, v. THE ATCHI-
SON, TOPEKA AND SANTA FE RAILWAY COM-
PANY, Defendant and Appellant.

Robert W. Walker, J. H. Cummins and Matthew H. Witteman for Defendant and Appellant.

Magana, Olney, Levy, Cathcart & Gelfand and Victor E. Kaplan for Plaintiff and Respondent.

FORD, J.—This is an appeal from a judgment in favor of the plaintiff in an action to recover for personal injuries brought pursuant to the provisions of the Federal Employers

Liability Act. (45 U.S.C.A. § 51 et seq.) The principal contention is that the evidence was insufficient to justify the jury's determination that the plaintiff had suffered damages in the amount of $21,600. An adverse ruling with respect to that contention was made by the trial court in its denial of the defendant's motion for a new trial.

In determining the sufficiency of the evidence, this court must view it in the light most favorable to the plaintiff. (*Rudolph* v. *Tubbs,* 46 Cal.2d 55, 56 [291 P.2d 913].) The pertinent evidence which lends support to the determination made upon the issue of damages will be stated. The plaintiff, a switchman employed by the defendant, was injured on May 18, 1957, while he was working with a switching crew in San Bernardino. At that time he was 50 years old. The plaintiff fell from the top of a moving boxcar into a gondola car. The witness Graham testified that he "more or less dove off of the car head first." When the engineer, Mr. Bussey, came to the place where the plaintiff had fallen, the plaintiff said that his back, left arm, and head ached. He was taken away in an ambulance.

Late on the day of the accident the plaintiff was removed to a hospital in Los Angeles. He was there 11 or 12 days. He suffered no broken bones, but he felt pain in his left hand, arm, the left side of his head, his left thigh, and in the small of his back and between his shoulders. After he left the hospital he returned once a week for the first three weeks and every two weeks thereafter until he resumed work on July 25, 1957, but he was given no treatment. As to his areas of complaint at the time he returned to his duties with the defendant, he testified as follows: "Left shoulder and arm and back between my shoulders, small of my back and my neck and the side of my head was very sore." He went to see Dr. Wilson in San Bernardino several times after he started to work again, but received no treatment. In the course of working with the switching crew, he tried to obtain an assignment of work which "was a little easier in order to be able to hang on." He tried to avoid climbing cars or "catching" cars going at high speeds. He received some relief from treatments given him by a chiropractor. He testified:[1] "If I am forced to work a job where I have to climb the cars and set the hand brakes where you have to do a lot of lifting and straining, why, sometimes at the close of the day I have to

---

[1] The trial was in June of 1961, more than four years after the accident.

go to the chiropractor." But he managed to carry on his regular duties in his employment and to work steadily. At the time of the trial he was working eight hours or more a day, but there were days when work was not available. As to the effect on him of one phase of the work, that of setting hand brakes on cars, he testified as follows: "Q. With regard to your mentioning the way you turned these brakes, what effect does that have on you, if any? A. Well, it hurts the back terrible. It is lifting, strictly lifting just like you are picking up a heavy weight with one hand and sometimes the brakes are hard to work. It takes quite a bit of effort to get them wound up. Then if you are cut off with several cars and you are going any distance, you control the speed of the car, got to keep setting them and letting them off, let it off a little and set it back up. It is very strenuous."

As to his physical condition, the plaintiff gave the following testimony: "Q. At first how often would you have headaches? A. Well, sometimes it is continuous and then it would come and go. What I mean is continuous for two or three days at a time. Q. And what did you do for them, if anything? A. I used to take pills. Q. Now, you say this finally abated after a couple of years? A. Yes, it seems to have abated somewhat, cleared up. Q. You felt some improvement, did you not, in your injuries other than your head? A. Yes. Q. Let's talk about your neck. A. Well, since the accident I haven't been able to sleep on a pillow and I still can't sleep on a pillow on account of my neck. Q. Did it make some improvement? A. Yes, it has improved some. Q. How about your low back? A. I notice if I am the least bit fatigued or any excitement, my back trembles. Q. Do you have any pain in your low back? A. Not so much if I don't strain or lift heavy, something like that. Q. Is there any type of work that you do on the railroad that affects any of your injuries? A. Well, this wrist especially, pulling pins is where you cut the cars loose from one another and they have a lever you lift to lift the pin up. If those are a little hard to lift and you have to jerk on it, why, it is very painful. Q. You are indicating your left wrist? A. Yes. And carrying the lantern, giving signals with the lantern, I am lefthanded and I am prone to carry it in my left hand. As long as I carry it straight, I don't notice it; but when I hold it up like that and move the lantern, it is painful across the wrist. Q. How about your left arm as such; has it improved? A. Well, yes, but it is very weak. I have to be awful careful. I don't trust myself

hanging with it, one arm at a time. I have to watch getting on cars where if you are going so you catch hold with the left hand first, I am pretty careful I don't—— Q. You are able to do it? A. I do it. I have fallen because of it, yes. Q. How about your neck; has that seemed to improve? A. Yes, it has improved to what it was but I would say the last year I don't see any improvement in it. Q. Has your arm condition become about stationary after its improvement? A. The shoulder, if I happen to roll over on my left shoulder in my sleep, is very painful. It will wake me up in a short time. It starts hurting. I can't lay on my left shoulder. Another thing. I can't stay in one position very long in bed. Last night I went to bed a little after 10:00 and was up a little after 4:00. My back was hurting and I was restless and I just got up. Q. Other than the press of a trial—let's take a year ago—did you have any trouble with sleeping at night? A. Oh, yes, since I have been injured I haven't had a night's rest. Q. What seems to pain or bother you? A. Well, if I lay in one position very long, I have got to move. I wake up and roll and toss so much and it bothers my back, the small of my back especially, lying in bed.''

Dr. Reuben Merliss examined the plaintiff on several occasions at the request of the plaintiff's attorneys. The first examination was on May 13, 1958. From the history given him by the plaintiff and from his examination, he arrived at a diagnosis which he expressed as follows: ''I have listed five conditions. The first was an injury to the neck. The second was an injury to the soft tissue structures about the left shoulder. Third was an injury to the back, the low back. The fourth was an injury to the nerve trunks going into the left arm which I believed was responsible for his pain, his clumsiness, his disturbed sensation in the left hand; and cerebral concussion.'' He found that the plaintiff had suffered a loss of gripping power in the left hand, that the reflexes in the left arm were not as active as in the right, and that there was ''some stretching injury to the neck resulting in spasm of the muscles.''

Dr. Merliss saw the plaintiff again on September 29, 1959. He found some tenderness in the thoracic region of the back. Although the plainiff was lefthanded, his right hand had a stronger grip. The circumference of the right arm around the biceps was greater than that of the left.

On January 24, 1960, Dr. Merliss made another examination of the plaintiff. The weakness in the grip of the left hand as

compared with the right hand was evident. The complaints of the plaintiff when he was seen in June of 1961 were related by the witness as follows: "He complained still of some back distress. He complained of soreness and stiffness in the neck. He complained of weakness and tremulousness of the left arm. In other words, it wasn't steady. He told me that he felt it was growing progressively worse. He said he couldn't even use a screwdriver with his left hand, and he is a left-handed man." Dr. Merliss' opinion was that the condition of the left arm then existing would be permanent in nature. He further stated: "And whatever symptoms he has now . . . probably will persist in about the same level for the future." On cross-examination he referred to the plaintiff's back condition as a chronic sprain. While that condition had "improved to a certain extent," the plaintiff "still was having symptoms" when the witness last saw him. In his opinion, the back would remain about as it was, regardless of whether the plaintiff worked or rested.

At the time of the trial the plaintiff was 54 years old. In an instruction the trial court informed the jury that the court took judicial notice of the fact that the expectancy of life of a person aged 54 years is 22 years.

The plaintiff did not claim that he had personally incurred any medical expenses as to which he was entitled to recovery. The defendant argues that $20,000 of the verdict represented general damages, since the plaintiff's loss of wages for the 75 days he was away from work was approximately $1,600,[2] and that the evidence does not support an award in that amount as general damages.

██ The law which governs the appellate review of an award of damages for personal injuries is set forth in *Seffert* v. *Los Angeles Transit Lines*, 56 Cal.2d 498 [15 Cal.Rptr. 161, 364 P.2d 337]. It is there stated, at pages 506-508: "It must be remembered that the jury fixed these damages, and that the trial judge denied a motion for new trial, one ground of which was excessiveness of the award. These determinations are entitled to great weight. The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case,

---

[2]The plaintiff testified that at the time of the accident his approximate rate of pay was "sixteen dollars and something for eight hours." He further testified that in the period of 12 months prior to the accident his average gross earnings were approximately $632 per month.

see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court (*McChristian* v. *Popkin,* 75 Cal.App.2d 249, 263 [171 P.2d 85].) The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury. . . . There are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of the damages suffered by a plaintiff as a result of the wrongful act of the defendant. The duty of an appellate court is to uphold the jury and trial judge whenever possible. (*Crystal Pier Amusement Co.* v. *Cannan,* 219 Cal. 184, 192 [25 P.2d 839, 91 A.L.R. 1357].) The amount to be awarded is 'a matter on which there legitimately may be a wide difference of opinion' (*Roedder* v. *Rowley,* 28 Cal.2d 820, 823 [172 P.2d 353]). In considering the contention that the damages are excessive the appellate court must determine every conflict in the evidence in respondent's favor, and must give him the benefit of every inference reasonably to be drawn from the record (*Kimic* v. *San Jose-Los Gatos etc. Ry. Co.,* 156 Cal. 273, 277 [104 P. 312]). . . . Basically, the question that should be decided by the appellate courts is whether or not the verdict is so out of line with reason that it shocks the conscience and necessarily implies that the verdict must have been the result of passion and prejudice.''

 It is true that the plaintiff was able to return to his work 75 days after the accident and that he worked steadily thereafter. But the trier of fact could reasonably conclude that his endeavors entailed recurring pain and suffering and that it was much more difficult for him to perform his duties after his resumption of work than it had been before the accident. Moreover, there was substantial support for the inference that his capacity to obtain rest at night had been materially impaired. The trier of fact was warranted in reaching the conclusion that the plaintiff's physical condition, as described by him at the trial, was one which was reasonably certain to be permanent in nature. The defendant argues that ''Dr. Patterson [who was called as a witness by the defendant] could find nothing wrong with him—aside from his subjective complaints which, in substance, form the

basis of Dr. Merliss' opinion that plaintiff's condition is permanent and stationary." But that argument is not persuasive because, as said by Justice Spence in *Taylor* v. *Lowenstein*, 113 Cal.App. 665 [298 P. 847], at page 668: "Medical science and human experience teach us that the extent of personal injuries cannot be measured solely by objective signs." (See also *Coleman* v. *Galvin*, 66 Cal.App.2d 303, 305 [152 P.2d 39]; *Music* v. *Southern Pacific Co.*, 91 Cal. App.2d 93, 99-100 [204 P.2d 422]; *Johnson* v. *Pearson*, 100 Cal.App. 503, 507 [280 P. 394].) It cannot be denied that the amount of the verdict is high and that it may be more than would have been awarded if the members of this court were the triers of the facts, but it cannot be said that, as a matter of law, the award was so high that it shocks the conscience and gives rise to the presumption that it was the result of passion or prejudice on the part of the jurors.

There is no reason to change the determination just expressed because of the defendant's contention that it was prejudicial error to instruct the jury upon the subject of damages arising from impaired future earning capacity.[3] It is asserted that there was no evidence upon which to base the instruction because the plaintiff had worked steadily for almost four years since the accident in the same kind of employment as that in which he had been previously engaged and had received earnings equal to or greater than those which he had enjoyed before he suffered his injuries. But, as succinctly stated in *Connolly* v. *Pre-Mixed Concrete Co.*, 49 Cal.2d 483 [319 P.2d 343], at page 489: "Loss of earning power is an element of general damages which can be inferred from the nature of the injury, without proof of actual earnings or income either before or after the injury, and damages are awarded for the loss of ability thereafter to earn money." In view of the plaintiff's age and the evidence as to the discomfort involved in the performance

---

[3] The instruction given was as follows: "If you should find that plaintiff is entitled to a verdict and should find also that his power to earn money has been so impaired by the injury in question that he will suffer a pecuniary loss in the future from that impairment, then you will award him such sum as will compensate him reasonably for any such future detriment he is reasonably certain to suffer. In fixing this amount you may consider what said plaintiff's health, physical ability and earning power were before the accident and what they are now, the nature and extent of his injuries, whether or not they are reasonably certain to be permanent, or if not permanent, the extent of their duration, all to the end of determining the effect of his injuries upon his future earning capacity and the present value of the loss so suffered."

of his duties and as to his impaired agility, the trier of fact could properly find that he was reasonably certain to suffer a loss of future earnings because of inability to work for as long a period of time in the future as he could have done had he not sustained the accident. (See *Guerra* v. *Balestrieri*, 127 Cal.App.2d 511, 519 [274 P.2d 443]; *Khan* v. *Southern Pac. Co.*, 132 Cal.App.2d 410, 418 [282 P.2d 78]; *Paxton* v. *County of Alameda*, 119 Cal.App.2d 393, 414 [259 P.2d 934].) The challenged instruction permitted, but did not compel, a finding of impairment of future earning power and its use was justified by the evidence and the inferences which could reasonably be drawn therefrom. There was no error.

The judgment is affirmed.

Shinn, P. J., and Files, J., concurred.