[Civ. No. 27729. Second Dist., Div. Two. July 22, 1964.]

EDMUND SWEENEY, JR., et al., Plaintiffs and Appellants, v. ALBERT POZARELLI et al., Defendants and Respondents.

Jack Dunaway for Plaintiffs and Appellants.

Spray, Gould & Bowers, Bernard A. Newell, Jr., Gilbert, Thompson & Kelly, William D. Jennett and Jean Wunderlich for Defendants and Respondents.

ASHBURN, J.†—Plaintiffs Sweeney, husband and wife, appeal from an adverse judgment following jury trial of their action for damages for personal injuries alleged to have been received through negligence of defendants Albert Pozarelli and Hugh Neville in "a three-way rear end automobile accident" (quoting pretrial conference order).

The accident happened in Los Angeles on the Hollywood Freeway near the main interchange, the three cars being in the middle lane and headed easterly. The other two cars were following that of Sweeney and in immediate sequence. Plaintiffs' Cadillac was first, Pozarelli's Volkswagen next, followed by Neville's Ford. Traffic was heavy and was "stop and go" or "slow and go." The joint pretrial statement says that "plaintiffs' automobile came to a stop behind other stopped traffic and was struck from the rear by a Volkswagon being driven by defendant, Albert Pozarelli. Said Volkswagon was either simultaneously, or thereafter, struck from the rear by a 1957 Ford being driven by defendant, Hugh Neville."

The principal question presented on this appeal is whether there was substantial evidence of contributory negligence on the part of Sweeney and whether it was reversible error for the court to charge the jury upon that subject.

The whole line of cars was traveling at speed variously estimated by the witnesses as 25 to 35 miles an hour. It appears without conflict that the traffic ahead of Sweeney stopped abruptly; the nearest car ahead of him was between

---

†Retired Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.

one and two and a half car lengths away; he had enough space in which to make a quick and abrupt stop (described in his deposition as almost a panic stop), which he did, coming to rest about 5 to 10 feet behind the closest car ahead. He testified that he applied the brakes (thus giving a light signal) and also that he gave a hand signal for a stop. He also said he heard tires screeching loudly, looked in his rear-view mirror and saw the Volkswagen coming into the rear end of his car, which was at a full stop when hit; the impact was a severe one; some few seconds (two or three or four) later there was another impact at the rear of his car but he did not see the Ford strike the Volkswagen; he and his wife were thrown forward on each impact and both were injured.

Defendant Pozarelli testified that his maximum speed before the accident was 25 to 30 miles; he saw the Cadillac stop when about the length of an American car away from him; when that vehicle stopped its rear lights flashed but plaintiff gave no hand signal; when the witness saw the flash of those rear lights he put on his own brakes but had no opportunity to give a hand signal; his wife (in the seat beside him) fell forward striking and cracking the windshield; his car stopped about a foot behind the Cadillac and did not then strike it; almost immediately after that he heard the brakes or tires of the Ford squealing, could not do a thing and was hit in the rear by the Ford, his car being pushed into the Cadillac.

Defendant Neville said he saw the Cadillac and the Volkswagen making a few stops in the "stop and go" traffic prior to reaching the scene of the accident; when it occurred he was two car lengths behind the other cars and saw the impact; the Cadillac was stopped at the time it was hit and that was all he saw; he did not see it slow down or stop; the Volkswagen ran into the back of it but was not going very fast and he, Neville, was then about two car lengths behind it going about 15 miles an hour; when he saw that impact he stepped on his own brakes and did not hit the Volkswagen but "I touched him"; that made hardly any noise and did not move the Volkswagen.

What is there in this factual picture to suggest or prove contributory negligence on the part of Mr. Sweeney? His speed—25 to 30 miles—was necessarily governed by that of the vehicles ahead of him and behind him and that was the speed at which they were traveling. Defendant Neville testified that the Volkswagen was not going very fast and "none of us were." The suggestion that the jury could have

found such speed excessive on that freeway is not convincing nor could that speed (if excessive) have any proximate effect upon the drivers behind him.

"The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon, and the condition of, the roadway." (Veh. Code, § 21703.) ▮ Plaintiff had a right in the exercise of reasonable care to assume and, unless alerted to the contrary, to rely upon the assumption that the drivers behind him would comply with the statutory mandate. (6 Cal.Jur.2d, § 181, p. 633; *Harris* v. *Johnson,* 174 Cal. 55, 58 [161 P. 1155, Ann. Cas. 1918E 560, L.R.A. 1917C 477]; *Dickinson* v. *Pacific Greyhound Lines,* 55 Cal.App.2d 824, 827 [131 P.2d 401].) ▮ Of course the one who so relies upon the conduct of another must be exercising reasonable care himself. Thus arises the question which respondents emphasize, whether plaintiff's failure to give a hand signal while making one with an electrical signal device constitutes negligence. The statute (§ 22110) says: "The signals required by this chapter shall be given either by means of the hand and arm or by a signal lamp or mechanical signal device, but . . . under any condition when a hand and arm signal would not be visible both to the front and rear of the vehicle or vehicles, then the vehicle or vehicles shall be equipped with, and signals shall be given by, a signal lamp or device." ▮ Plainly the type of signal to be given at noontime of a clear day (such as the one in this case) is optional with the driver who is required to signal, optional except under certain situations narrowly defined in the code section. ▮ Moreover section 22109 requires a signal from a stopping motorist only "when there is opportunity to give the signal."[1]

While plaintiff testified that he gave a hand signal, we here assume, as we must in the light of Pozarelli's testimony and the verdict, that plaintiff gave only the lamp signal. Incidentally Pozarelli testified that he himself did not have an opportunity to give a hand signal before stopping behind the Cadillac. ▮ While it seems true that in certain exceptional circumstances the failure to give a hand signal in the daytime may be negligence notwithstanding the option given the

---

[1]Section 22109: "No person shall stop or suddenly decrease the speed of a vehicle on a highway without first giving an appropriate signal in the manner provided in this chapter to the driver of any vehicle immediately to the rear when there is opportunity to give the signal."

driver by the statute (cf. *Winningar* v. *Bales*, 194 Cal. App.2d 273, 276 [14 Cal.Rptr. 908]) that failure can become important only when it serves as a proximate cause of the accident. (*Zaferis* v. *Bradley*, 28 Cal.App.2d 188, 190-192 [3] [82 P.2d 70]; *McWane* v. *Hetherton*, 51 Cal.App.2d 508, 511 [125 P.2d 85]; *Reeves* v. *Lapinta*, 25 Cal.App.2d 680, 682 [78 P.2d 465]; *Petersen* v. *Lewis*, 2 Cal.2d 569, 572 [42 P.2d 311]; *Wohlenberg* v. *Malcewicz*, 56 Cal.App.2d 508, 512 [133 P.2d 12]; *Mahnkey* v. *Bolger*, 98 Cal.App.2d 628, 632 [220 P.2d 824]; *Shahinian* v. *McCormick*, 59 Cal.2d 554, 561 [30 Cal.Rptr. 521, 381 P.2d 377].) ▮ Pozarelli saw plaintiff's light signal and saw him stop, so it cannot be inferred that a hand signal would have given him any additional warning of plaintiff's intention to stop before hitting that car. ▮ We must deal in probabilities for mere possibilities are not evidence nor do they afford basis for factual inferences. (*Estate of Kuttler*, 185 Cal.App.2d 189, 204 [8 Cal. Rptr. 160]; *Eramdjian* v. *Interstate Bakery Corp.*, 153 Cal. App.2d 590, 602 [315 P.2d 19]; *Reese* v. *Smith*, 9 Cal.2d 324, 328 [70 P.2d 933]; *Sweeney* v. *Metropolitan Life Insurance Co.*, 30 Cal.App.2d Supp. 767, 772 [92 P.2d 1043]; *Fewel & Dawes, Inc.* v. *Pratt*, 17 Cal.2d 85, 89 [109 P.2d 650].)

▮ Defendant Neville did not see the Cadillac stopping nor pay any attention to its driver before he saw it at a full stop. "At the time of the accident it was stopped and then that's all I saw."

We find no basis here for an inference that a hand signal was necessary to the exercise of due care by plaintiff or that failure to give one affected or could affect the conduct of either defendant driver and operate as a proximate cause of the accident.

▮ So far as defendants are concerned, it may properly be observed that "The mere fact that a driver of a vehicle does run down the vehicle ahead of him furnishes some evidence that he either was driving at too high a rate of speed, or that he was following too closely the vehicle ahead of him (*Gornstein* v. *Priver*, 64 Cal.App. 249 [221 P. 396]; *Rodriguez* v. *Savage Transportation Co.*, 77 Cal.App.2d 162 [175 P.2d 37]; *Linde* v. *Emmick*, 16 Cal.App.2d 676 [61 P.2d 338].)" (*Apodaca* v. *Haworth*, 206 Cal.App.2d 209, 215-216 [23 Cal.Rptr. 461].) ▮ Indeed an inference of negligence (res ipsa loquitur) arises against such driver, an inference that he is the one responsible for the accident (*Ponce* v. *Black*, 224 Cal.App.2d 159, 162-163 [36 Cal.Rptr. 419]; *Pacific*

*Greyhound Lines* v. *Querner,* 187 Cal.App.2d 190, 192-193 [9 Cal.Rptr. 370] ; *Persike* v. *Gray,* 215 Cal.App.2d 816, 820 [30 Cal.Rptr. 603]), which inference must prevail unless or until defendant produces evidence to offset it; defendant has ''the burden of presenting sufficient evidence to dispel or equally balance the inference of negligence raised by law.'' (*Kohl* v. *Disneyland, Inc.* 201 Cal.App.2d 780, 783 [20 Cal.Rptr. 367].) See also: *Dierman* v. *Providence Hospital,* 31 Cal.2d 290, 295 [188 P.2d 12] ; *Burr* v. *Sherwin Williams Co.,* 42 Cal.2d 682, 691 [268 P.2d 1041] ; *Hardin* v. *San Jose City Lines, Inc.,* 41 Cal.2d 432, 437 [260 P.2d 63] ; *Seffert* v. *Los Angeles Transit Lines,* 56 Cal.2d 498, 502 [15 Cal.Rptr. 161, 364 P.2d 337]. ▮▮▮ No such offsetting evidence is found in the instant record, hence the presumption that negligence of defendant was the proximate cause of the accident and plaintiffs' injuries, if any, remains and is enough to require a judgment for plaintiffs. We have then a case in which there is no evidence of substantiality pointing to negligence on the part of plaintiff and a presumption that the accident was proximately caused by defendants' negligence. At least that is true as to defendant Pozarelli.

▮▮▮ Perhaps the testimony of Neville and his wife that his car merely touched the Volkswagen and did not push it into plaintiffs' Cadillac, when credited by the jury, would have been sufficient to dispel the presumption against him were it not for the fact that it is opposed to the pretrial order and joint statement of counsel. The former says: ''This is a personal injury case resulting from a three-car rear end automobile accident. . . . '' Also that Pozarelli contended that ''he was required to and did stop and was then hit in the rear by the vehicle of the defendant Neville and was thereby pushed into the plaintiffs' vehicle''; that Neville contended ''that he did not have reaction time within which to bring his vehicle to a stop before impact'' with Pozarelli's car. The joint statement says that plaintiffs' car was struck by Pozarelli's Volkswagen and that it, the Volkswagen, ''was either simultaneously, or thereafter, struck from the rear by a 1957 Ford being driven by defendant, HUGH NEVILLE.'' Also that ''HUGH NEVILLE was the owner and operator of a 1957 Ford which struck the said Volkswagon from the rear.''

▮▮▮ ''It is settled that, when filed, a pretrial conference order, unless modified at or before trial, supersedes the issues raised by the pleadings and controls the subsequent course of the case. [Citations.] The pretrial order limits the issues to be tried [citation] and those issues, neither raised at the

pretrial conference nor designated in dispute in the pretrial conference order, are no longer issues in the case. [Citations.] As this court said in *Fitzsimmons* v. *Jones* (1960) 179 Cal.App.2d 5, 8 [3 Cal.Rptr. 373], '[t]he purpose of the pretrial procedure is to place the case in focus so that the defined and precise issues may be resolved as quickly as possible.' Until presented with a request for its modification, the trial judge has a right to rely on the posture of the case defined by the pretrial conference order. [Citations.]'' (*Feykert* v. *Hardy*, 213 Cal.App.2d 67, 74 [28 Cal.Rptr. 510].)

Aside from the foregoing Neville is still confronted with the absence of any showing of proximate negligence of plaintiff.

 That it is prejudicial error to instruct on contributory negligence where there is no substantial evidence to support that plea is settled law. (*Burks* v. *Blackman*, 52 Cal.2d 715, 719 [344 P.2d 301]; *Shippy* v. *Peninsula Rapid Transit Co.*, 197 Cal. 290, 296 [240 P. 785].) The court erred in giving such instructions at bar and this requires a reversal as to both defendants.

 Respondent Pozarelli would sustain the judgment upon the alternative ground that ''there was no substantial evidence that either appellant suffered any injury or damage as a result of said collision.''

The exhibits having been returned to the parties they are not before us and the oral evidence is not clear as to whether there was serious damage to any of the automobiles. However, plaintiff testified that the whole chassis of his car was about an inch off the ground; that the vehicle was worth $7,500 before the accident and he did not repair it but sold same for $3,900. It also appears that the repair bill on Pozarelli's car was $171.66 and covered items such as ''replace chrome tailpipe tip,'' ''straighten rear bumper and alignment, straighten brackets and supports.''

The argument proceeds upon the hypothesis that the jurors may reject the testimony of any witness, wholly or in part, and that that is what happened to the testimony of both plaintiffs. However, if we concede that this was done in this case and not done arbitrarily, the testimony of Dr. Lopez remains. His examinations of plaintiffs, made promptly after the accident, reveal tenderness and spasm and limitation of motion in the shoulder of Mr. Sweeney, also tenderness in the abdomen and aggravation of a quiescent lower urinary in-

fection which apparently was of long standing; he also said that "[s]uch an accident could, can and often does produce these types of injuries." Dr. McKay, urologist, to whom Dr. Lopez referred the patient, reported among other things that "in all probability the recent automobile accident has been a factor in stirring up this infection."

Mrs. Sweeney testified she was knocked from the seat almost to the floor, her head hit the dashboard and she then fell to the floor; when almost back in the seat their car was hit again and she went down a second time; she felt shaken up; the "next day I woke up very sore all over, and, and if I remember right, I had a headache that day and I didn't feel good at all, so I decided to see the doctor"; her back and neck hurt a lot; if she "stood any amount of time it hurt bad. I had to sit down." Dr. Lopez's diagnosis was given by him as follows: "It was a diagnosis of shock. The second one was a certain condition called a cervical syndrome, traumatic. This affects the spinal column and the surrounding soft tissues in that area, blood vessels, ligaments, nerves, etc.

"The third one was fibrocystitis and myositis. That's inflammation or irritation of the tissues surrounding the spinal column from the second level in the neck, second vertebra in the neck, down to the second vertebra in the chest and also lower down from the fifth to approximately the tenth to twelfth vertebral level in the back and also from, apparently, the first lumbar vertebra to the second sacral vertebra. That's in the lower back, sir." The doctor gave her sedation, neck traction, heat treatments to the back and neck and she wore a neck collar for about two months; her headaches were persistent for a long while.

Respondent relies on the testimony of Dr. Donald Cass who examined each plaintiff on behalf of defendant, and counsel argues that his testimony belies that of Dr. Lopez and of plaintiffs and the jurors were entitled to reject the same and presumptively did so.

Dr. Cass testified that he examined the plaintiffs on May 19, 1961, which was some nine months after the accident. His diagnosis as to Mrs. Sweeney was that she "had recovered from the effects of any injury she may have sustained and that her symptoms were entirely subjective.

"Q. What do you mean by subjective?

"A. They weren't backed up by any objective changes; that is, the story of the patient is the subjective statement. The physical examination, the changes that the doctor finds are objective." As to Mr. Sweeney Dr. Cass said his di-

agnosis was "he had a pre-existing urological disease, probably a pyelonephrosis."

"Q. What is that, sir?

"A. Well, the pelvis of the kidney is the funnel that the urine collects in before it goes down to the bladder, and inflammation of this part of the kidney is called pyelitis and the pyelonephrosis would be that he has an infectious disease, a chronic disease, of his kidneys. He has bacteria in his urine and he also has pus in his urine, so that he still has a disease and his history is that he has had it all his life" and that such a chronic disease could not be caused or aggravated by an accident. Also, "I thought that he had recovered from the effects of any injury he may have sustained."

Although there was considerable self-contradiction in the testimony of Edmund Sweeney and a lesser amount in that of his wife and they were impeached in certain respects, the circumstances indicate that plaintiffs in all probability did receive the falls and blows and soreness and aches and pains they described; whether they were serious injuries or later developed serious aspects is aside from the question of whether plaintiffs received compensable injuries. And the fact that some of their symptoms were not objective but strictly subjective falls far short of proof that they were unreal.

*Reznick* v. *Hillman-Sidney Auto Sales*, 216 Cal.App.2d 569, 572 [30 Cal.Rptr. 889] : "This court, speaking through Mr. Presiding Justice Moore in *Sandoval* v. *Southern Cal. Enterprises, Inc.*, 98 Cal.App.2d 240, 255 [219 P.2d 928] said '[i]t is a scientific truism that the extent of personal injuries cannot be measured solely by objective signs. While traumatic injuries may leave few or no outward signs of bruises and contusions, yet a severe concussion of the brain or "injury to the nervous system may result in far greater or more lasting pain and disability than do many types of injuries which are plainly visible." [Citations.] '

"In the cited *Coleman* case [66 Cal.App.2d 303 (152 P.2d 39)] Mr. Justice Spence spoke for the court as follows, at page 305-306: 'Defendant makes much of the fact that there were no serious fractures of the bones in plaintiffs' bodies. He also calls attention to the fact that the remaining signs of the injuries at the time of trial, which was held one year later, were largely subjective rather than objective. From these facts he argues that only very small awards would have been justified and that the actual awards were therefor excessive. While the facts to which defendant refers have some

significance, they are not conclusive. As we said in *Taylor* v. *Lowenstein*, 113 Cal.App. 665 [298 P. 847] at page 668, "Counsel for appellant calls our attention to the fact that the only objective signs of the injuries at the time of the trial were certain scars which were not prominent, and that everything else was subjective. Even though this be conceded, it does not follow that the judgment should be set aside as excessive. Medical science and human experience teach us that the extent of personal injuries cannot be measured solely by objective signs. Injuries of traumatic origin may leave few, if any, outward signs and yet a severe concussion of the brain or injury to the nervous system may result in far greater and more lasting pain and disability than do many types of injuries which are plainly visible. As was said in *Johnson* v. *Pearson*, 100 Cal.App. 503 [280 P. 394, 396] at page 507: 'It is also a fact, well within human experience, that suffering from the disruption of the nervous system of the human body may be, and often is, more intense and severe than most any other form of suffering.' " ' See also *Robison* v. *Atchison, Topeka & S.F. Ry. Co.*, 211 Cal.App.2d 280, 286-287 [27 Cal.Rptr. 260]; *Music* v. *Southern Pacific Co.*, 91 Cal.App.2d 93, 99-100 [204 P.2d 422]."

 While judges and juries may reject all or portions of a witness' or of several witnesses' testimony they can do so only when acting reasonably. "But the trier of fact is not entitled, arbitrarily or upon mere caprice, to disregard uncontradicted, entirely probable testimony of unimpeached witnesses." (*Mantonya* v. *Bratlie*, 33 Cal.2d 120, 127 [199 P.2d 677].) See also: *Gomez* v. *Cecena*, 15 Cal.2d 363, 366 [101 P.2d 477]; *McVey* v. *McVey*, 132 Cal.App.2d 120, 123 [281 P.2d 898]; *Krause* v. *Apodaca*, 186 Cal.App.2d 413, 417 [9 Cal.Rptr. 10]. To hold that the jury reasonably could have concluded that plaintiffs suffered no compensable injuries in this accident would be wholly unwarranted by the evidence in this case.

As the errors just reviewed were fatal to the judgment there is no occasion to discuss other questions posed by respective counsel.

Judgment reversed.

Herndon, Acting P. J., and Roth, J., concurred.

The petitions for a rehearing were denied August 17, 1964, and respondents' petitions for a hearing by the Supreme Court were denied September 18, 1964.