**John Edward QUILTER, Plaintiff-Appellee,**

**v.**

**ELGIN, JOLIET AND EASTERN RAILWAY COMPANY, Defendant-Appellant.**

**No. 17165.**

United States Court of Appeals
Seventh Circuit.

March 28, 1969.

Rehearing Denied May 22, 1969.

Harlan L. Hackbert, Chicago, Ill., for defendant-appellant, Hackbert, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., of counsel.

Philip H. Corboy, Edwin A. Strugala, Chicago, Ill., for plaintiff-appellee.

Before DUFFY, Senior Circuit Judge, and KILEY and CUMMINGS, Circuit Judges.

DUFFY, Senior Circuit Judge.

This is a suit under the Federal Employers' Liability Act (45 U.S.C. § 51 et seq.) to recover damages for personal injuries alleged to have been sustained by plaintiff on July 9, 1963, when he operated a railroad switch in defendant's South Chicago yard.

After a trial, the jury returned a verdict in favor of plaintiff, awarding damages of $144,000 for which sum the District Court entered judgment.

In December 1939, plaintiff commenced work for defendant as a switchman. In 1942, he entered military service but was discharged six months later for an aggravation of a peptic ulcer. Plaintiff's seniority permitted him, at times, to operate three multiple or "puzzle" switches which controlled the movement of trains from Gary, Indiana, to defendant's South Chicago yard.

On July 9, 1963, plaintiff was working as the puzzle switch operator. On the night in question, plaintiff noticed the switch "worked pretty stiff." He pressed his foot on the lever which "let loose suddenly." Plaintiff fell and later reported pains in his hip. A doctor examined him, gave him some pills and sent him home. Plaintiff worked the following night but at the end of his turn reported to the dispensary. He was examined by three doctors and was sent to a hospital for an examination by Dr. Meyer.

On July 17, 1963, x-rays revealed a 2½ inch fracture through the back part of the acetabulum. Plaintiff received forty-eight treatments from July 17, 1963 to February 10, 1964. An examination on November 19, 1963 by Dr. Zeiss, a company physician, disclosed normal muscle size and full motion of the hip, knee and ankle joints. An x-ray taken on January 3, 1964, showed a gradual healing of the acetabulum. An x-ray taken on February 12, 1964, revealed "complete healing of the fracture of the acetabulum on the left side." Dr. Zeiss gave plaintiff a back-to-work slip for February 17, 1964.

On February 24, 1964, plaintiff went to his own doctor, a Dr. O'Donoghue and gave him a history of loss of weight, nausea and vomiting for the preceding three weeks. Plaintiff had not told any of the defendant's doctors or supervisors of these complaints. Dr. O'Donoghue put plaintiff in a hospital and diagnosed the condition as a resurgence of peptic ulcer. On March 10, 1964, Dr. O'Donoghue operated, resecting the stomach and vagus nerve. About 70% of plaintiff's stomach was removed.

Because of plaintiff's history of accident, Dr. O'Donoghue referred him to Dr. Howard, an orthopedic surgeon, who operated on plaintiff's hip by cutting away some of the labrum or cartilage on the rim of the acetabulum which had been inverted into the hip joint, and thus enabled the femoral head of plaintiff's hip joint to move more freely.

Plaintiff was discharged from the hospital on December 12, 1964. He was examined by Dr. Zeiss on August 5, 1965, and was given a work slip. He returned to work for the defendant on August 9, 1965, and worked regularly as a switchman until December 5, 1966, a period of almost sixteen months.

Like other railroads, defendant has a rule prohibiting the use of intoxicants by employees while on duty. Plaintiff was familiar with this rule prior to July 9, 1963, for he had previously been suspended for its violation.

Some time in November 1965, plaintiff started drinking "a couple of shots of whiskey" on his way to work, and again outside the gate during his lunch hour. In March 1966, he was again suspended for sixty days for drinking. On December 5, 1966, he had five or seven shots of whiskey before going to work. He was taken to the dispensary by the trainmaster where he was found to be under the influence of alcohol. After an investigation and hearing, he was discharged.

Plaintiff now explains that he drank on the job because of pain in his hip resulting from his injury on July 9, 1963.

It may be noted that plaintiff never notified the Company or sought any medical help for relief from any such pain. At the investigative hearing leading to his discharge, he made no mention of pain as an excuse for his drinking. He also produced no evidence as to "sleepless nights" except for his own unsupported statement. However, it is without dispute that during the sixteen month working period after his hip operation, he walked with a limp and dragged his left leg, which may have been obvious to the judge and jurors at his trial.

At the time of the trial herein, plaintiff was fifty-three years old. His life expectancy was 20.09 years. His wages in 1960 were $6600; in 1961, $6500 and in 1962, $6800, which is an average of about $565 a month or an annual wage of $6780. Medical expenses were $4,000.

■ Defendant asserts that the plaintiff was not entitled to an instruction which included loss of future earnings. However, evidence was submitted which supported a finding of permanent injury and consequent reasonable certainty of loss of future earnings, and in that case the instruction is proper. Illinois Central Railroad Co. v. Staples, 272 F. 2d 829 (8 Cir., 1959). This is correct despite the action of the railroad in relation to plaintiff's drinking. See Robison v. Atchison, T. & S. F. Ry. Co., (1962), 211 Cal.App.2d 280, 27 Cal.Rptr. 260, 264; Adams v. Atchison, T. & S. F. Ry. Co., (Mo.1955) 280 S.W.2d 84, 93–4.

Defendant also bitterly complains of the trial testimony of Dr. Howard who performed an operation on plaintiff's hip. Defendant's brief states: "Dr. Howard's testimony is a shocking demonstration of the difference between the practice of forensic medicine in the courtroom and the practice of medicine and surgery in the hospital."

■ It is, indeed, difficult to reconcile the testimony of Dr. Howard on the trial with some of the hospital records made by him. No reason has been suggested for the variance between Dr. Howard's opinion as a witness and his recorded opinion as a surgeon. However, the credibility of the doctor or of any other witness is a matter for the jury.

The award of the jury was indeed high. This would seem to have been an appropriate case for the trial judge to order remittitur. However, the trial judge did not enter such an order. He approved the award.

In Bucher v. Krause, 7 Cir., 1953, 200 F.2d 576, we held that we may review, for abuse of discretion, a refusal to set aside a verdict. In Dagnello v. Long Island Railroad Company, 2 Cir., 1961, 289 F.2d 797, 806, the Court said: " * * * [W]e appellate judges [are] not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand. We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit * * *." It is our view that the award in this case is very near the upper limit.

■ There was some testimony as to permanent disability and prospective pain which the jury may have believed. They also could have considered the pattern of steadily increasing wages and the decreasing purchasing power of our currency. We cannot say that the verdict was "monstrous," Affolder v. New York, Chicago & St. Louis R. Co., 339 U.S. 96, 101, 70 S.Ct. 509, 94 L.Ed. 683, or "grossly excessive," Southern Pac. Co. v. Guthrie, 9 Cir., 180 F.2d 295, or otherwise violative of expressed standards. Dagnello v. Long Island R. Co., supra; Grunenthal v. Long Island R. Co., 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (Nov. 18, 1968).

The judgment of the District Court is

Affirmed.