[S.F. No. 24336. Feb. 28, 1985.]

LAWRENCE FEIN, Plaintiff and Appellant, v.
PERMANENTE MEDICAL GROUP, Defendant and Appellant.

## Counsel

Morton L. Friedman, Allan J. Owen, Rex-Ann S. Gualco, Friedman, Collard, Poswall & Thompson, Arthur E. Schwimmer and Lawrence H. Tribe for Plaintiff and Appellant.

Jerome B. Falk, Jr., H. Joseph Escher III, Howard, Prim, Rice, Nemerovski, Canady & Pollak and David M. Harney as Amici Curiae on behalf of Plaintiff and Appellant.

Thelen, Marrin, Johnson & Bridges, Curtis A. Cole, Terry M. Burt, Michael T. Hornak, Rebecca A. Lewis and Donald A. Newman for Defendant and Appellant.

Alschuler, Grossman & Pines, Burt Pines, Howard Wollitz, Machida & Rosten, Kenneth F. Moss, Latham & Watkins, Bryant C. Danner, Donald P. Newell, Joseph A. Wheelock, Jr., Milton A. Miller, Musick, Peeler & Garrett, James E. Ludlam, Horvitz & Greines, Horvitz, Greines & Poster, Horvitz & Levy, Ellis J. Horvitz, Kent L. Richland, Marjorie G. Romans, John L. Klein, S. Thomas Todd, L. Savannah Lichtman, Cotkin, Collins, Kolts & Franscell, Raphael Cotkin, Larry W. Mitchell, Hassard, Bonnington, Rogers & Huber, Howard Hassard, David E. Willett, Charles Bond, Catherine I. Hanson and Fred J. Hiestand as Amici Curiae on behalf of Defendant and Appellant.

## Opinion

**KAUS, J.**—In this medical malpractice action, both parties appeal from a judgment awarding plaintiff about $1 million in damages. Defendant claims that the trial court committed reversible error during the selection of the jury, in instructions on liability as well as damages, and in failing to order that the bulk of plaintiff's award be paid periodically rather than in a lump sum. Plaintiff defends the judgment against defendant's attacks, but maintains that the trial court, in fixing damages, should not have applied two provisions of the Medical Injury Compensation Reform Act of 1975 (MICRA): Civil Code section 3333.2, which limits noneconomic damages in medical malpractice cases to $250,000, and Civil Code section 3333.1, which modifies the traditional "collateral source" rule in such litigation. Plaintiff's claims are based on a constitutional challenge similar to the chal-

lenges to other provisions of MICRA that we recently addressed and rejected in *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359 [204 Cal.Rptr. 671, 683 P.2d 670], *Barme* v. *Wood* (1984) 37 Cal.3d 174 [207 Cal.Rptr. 816, 689 P.2d 446], and *Roa* v. *Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920 [211 Cal.Rptr. 77, 695 P.2d 164]. We conclude that the judgment should be affirmed in all respects.

I

On Saturday, February 21, 1976, plaintiff Lawrence Fein, a 34-year-old attorney employed by the Legislative Counsel Bureau of the California State Legislature in Sacramento, felt a brief pain in his chest as he was riding his bicycle to work. The pain lasted a minute or two. He noticed a similar brief pain the following day while he was jogging, and then, three days later, experienced another episode while walking after lunch. When the chest pain returned again while he was working at his office that evening, he became concerned for his health and, the following morning, called the office of his regular physician, Dr. Arlene Brandwein, who was employed by defendant Permanente Medical Group, an affiliate of the Kaiser Health Foundation (Kaiser).

Dr. Brandwein had no open appointment available that day, and her receptionist advised plaintiff to call Kaiser's central appointment desk for a "short appointment." He did so and was given an appointment for 4 p.m. that afternoon, Thursday, February 26. Plaintiff testified that he did not feel that the problem was so severe as to require immediate treatment at Kaiser Hospital's emergency room, and that he worked until the time for his scheduled appointment.

When he appeared for his appointment, plaintiff was examined by a nurse practitioner, Cheryl Welch, who was working under the supervision of a physician-consultant, Dr. Wintrop Frantz; plaintiff was aware that Nurse Welch was a nurse practitioner and he did not ask to see a doctor. After examining plaintiff and taking a history, Nurse Welch left the room to consult with Dr. Frantz. When she returned, she advised plaintiff that she and Dr. Frantz believed his pain was due to muscle spasm and that the doctor had given him a prescription for Valium. Plaintiff went home, took the Valium, and went to sleep.

That night, about 1 a.m., plaintiff awoke with severe chest pains. His wife drove him to the Kaiser emergency room where he was examined by Dr. Lowell Redding about 1:30 a.m. Following an examination that the doctor felt showed no signs of a heart problem, Dr. Redding ordered a chest X-ray. On the basis of his examination and the X-ray results, Dr. Redding

also concluded that plaintiff was experiencing muscle spasms and gave him an injection of Demerol and a prescription for a codeine medication.

Plaintiff went home but continued to experience intermittent chest pain. About noon that same day, the pain became more severe and constant and plaintiff returned to the Kaiser emergency room where he was seen by another physician, Dr. Donald Oliver. From his initial examination of plaintiff Dr. Oliver also believed that plaintiff's problem was of muscular origin, but, after administering some pain medication, he directed that an electrocardiogram (EKG) be performed. The EKG showed that plaintiff was suffering from a heart attack (acute myocardial infarction). Plaintiff was then transferred to the cardiac care unit.

Following a period of hospitalization and medical treatment without surgery, plaintiff returned to his job on a part-time basis in October 1976, and resumed full-time work in September 1977. By the time of trial, he had been permitted to return to virtually all of his prior recreational activities—e.g., jogging, swimming, bicycling and skiing.

In February 1977, plaintiff filed the present action, alleging that his heart condition should have been diagnosed earlier and that treatment should have been given either to prevent the heart attack or, at least, to lessen its residual effects. The case went to judgment only against Permanente.

At trial, Dr. Harold Swan, the head of cardiology at the Cedars-Sinai Medical Center in Los Angeles, was the principal witness for plaintiff. Dr. Swan testified that an important signal that a heart attack may be imminent is chest pain which can radiate to other parts of the body. Such pain is not relieved by rest or pain medication. He stated that if the condition is properly diagnosed, a patient can be given Inderal to stabilize his condition, and that continued medication or surgery may relieve the condition.

Dr. Swan further testified that in his opinion any patient who appears with chest pains should be given an EKG to rule out the worst possibility, a heart problem. He stated that the symptoms that plaintiff had described to Nurse Welch at the 4 p.m. examination on Thursday, February 26, should have indicated to her that an EKG was in order. He also stated that when plaintiff returned to Kaiser late that same night with his chest pain unrelieved by the medication he had been given, Dr. Redding should also have ordered an EKG. According to Dr. Swan, if an EKG had been ordered at those times it could have revealed plaintiff's imminent heart attack, and treatment could have been administered which might have prevented or minimized the attack.

Dr. Swan also testified to the damage caused by the attack. He stated that as a result of the attack a large portion of plaintiff's heart muscle had died, reducing plaintiff's future life expectancy by about one-half, to about 16 or 17 years. Although Dr. Swan acknowledged that some of plaintiff's other coronary arteries also suffer from disease, he felt that if plaintiff had been properly treated his future life expectancy would be decreased by only 10 to 15 percent, rather than half.

Nurse Welch and Dr. Redding testified on behalf of the defense, indicating that the symptoms that plaintiff had reported to them at the time of the examinations were not the same symptoms he had described at trial. Defendant also introduced a number of expert witnesses—not employed by Kaiser—who stated that on the basis of the symptoms reported and observed before the heart attack, the medical personnel could not reasonably have determined that a heart attack was imminent. Additional defense evidence indicated (1) that an EKG would not have shown that a heart attack was imminent, (2) that because of the severe disease in the coronary arteries which caused plaintiff's heart attack, the attack could not have been prevented even had it been known that it was about to occur, and finally (3) that, given the deterioration in plaintiff's other coronary arteries, the heart attack had not affected plaintiff's life expectancy to the degree suggested by Dr. Swan.

In the face of this sharply conflicting evidence, the jury found in favor of plaintiff on the issue of liability and, pursuant to the trial court's instructions, returned special verdicts itemizing various elements of damages. The jury awarded $24,733 for wages lost by plaintiff to the time of trial, $63,000 for future medical expenses, and $700,000 for wages lost in the future as a result of the reduction in plaintiff's life expectancy.[1] Finally, the jury awarded $500,000 for "noneconomic damages," to compensate for pain, suffering, inconvenience, physical impairment and other intangible damages sustained by plaintiff from the time of the injury until his death.

After the verdict was returned, defendant requested the court to modify the award and enter a judgment pursuant to three separate provisions of MICRA: (1) Civil Code section 3333.2—which places a $250,000 limit on noneconomic damages, (2) Civil Code section 3333.1—which alters the collateral source rule, and (3) Code of Civil Procedure section 667.7—which provides for the periodic payment of damages. The trial court, which had rejected plaintiff's constitutional challenge to Civil Code sections 3333.2

---

[1] Plaintiff did not claim that the heart attack would reduce his earning capacity during his lifetime.

and 3333.1 in a pretrial ruling,[2] reduced the noneconomic damages to $250,000, reduced the award for past lost wages to $5,430—deducting $19,303 that plaintiff had already received in disability payments as compensation for such lost wages—and ordered defendant to pay the first $63,000 of any future medical expenses not covered by medical insurance provided by plaintiff's employer, as such expenses were incurred. At the same time, the court declined to order that the award for future lost wages or noneconomic damages be paid periodically pursuant to Code of Civil Procedure section 667.7, determining that the statute was not "mandatory" and that "under the unique facts and circumstances of this case" a periodic payment award of such damages would "defeat[] rather than promote[]" the purpose of section 667.7.

As noted, both parties have appealed from the judgment. Defendant maintains that the trial court committed reversible error in (1) excusing all Kaiser members from the jury, (2) instructing on the duty of care of a nurse practitioner, (3) instructing on causation, (4) permitting plaintiff to recover wages lost because of his diminished life expectancy, and (5) refusing to order the periodic payment of all future damages. Plaintiff argues that the judgment in his favor should be affirmed, but asserts that the court erred in upholding the MICRA provisions at issue here. Since defendant's claims go to the basic validity of the judgment in favor of plaintiff, we turn first to its contentions.

## II

At the outset of the empanelment of the jury, the court indicated that it would excuse from the jury those prospective jurors who would refuse to go to Kaiser for treatment under any circumstances and also those prospective jurors who were members of the Kaiser medical plan. When defendant noted its objection to the court's exclusion of the Kaiser members without conducting individual voir dire examinations, the court explained to the jury panel: "I am going to excuse you at this time because we've found that we can prolong the jury selection by just such a very long time by going through each and every juror under these circumstances. I'm not suggesting that . . . everyone who goes to Kaiser could not fairly and with an open mind resolve the issues in this case, but we may be here for four weeks trying to

---

[2]Plaintiff had anticipated the possible application of sections 3333.2 and 3333.1 before trial and had requested the court to declare the statutes unconstitutional at that time. After full briefing, the court rejected the constitutional attack. The court also ruled at that time that in order to avoid possible confusion of the jury, it would not inform them of the $250,000 limit and that—since the amounts of the collateral source benefits were not disputed—it would simply reduce the verdict by such benefits; neither party objected to the court's decision to handle the matter in this fashion.

get a jury under the circumstances. [¶] I hope you can appreciate that. Probably some of you have sat in on situations where we've tried to get jurors in cases and it just goes on and on and on and on because you'll be questioned in great detail." On inquiry, it turned out that 24 of the 60 persons on the initial jury panel were members of Kaiser. They were excused. Voir dire then proceeded in the ordinary fashion, with each party questioning the remaining jurors and exercising challenges for cause and peremptory challenges.

Although defendant does not contend that any of the jurors who ultimately served on the jury and decided the case were biased against it, it nonetheless asserts that the discharge of the Kaiser members was improper and warrants reversal. In support of its contention, it argues that a potential juror's mere membership in Kaiser does not provide a basis for a challenge for cause under the applicable California statute, Code of Civil Procedure section 602.

Past decisions do not provide a clear-cut answer to the question whether a potential juror's membership in Kaiser would itself render the juror subject to a statutory challenge for cause. Section 602 does not define with precision the degree of "interest" or connection with a party that will support a challenge for cause,[3] and courts in other states have come to different conclusions with respect to the eligibility of potential jurors whose relationship to one of the parties is similar to Kaiser members' relationship to defendant. Some cases have found error when a trial court has failed to excuse such persons for cause (see, e.g., *M & A Electric Power Cooperative* v. *Georger* (Mo. 1972) 480 S.W.2d 868, 871-874 [69 A.L.R.3d 1286] [members of "consumer" electrical cooperative]; *Weatherbee* v. *Hutcheson* (1966) 114 Ga.App. 761 [152 S.E.2d 715, 718-719] [policyholder of mutual insurance company]); other decisions, on which defendant relies, have found no error when a trial court has refused to excuse such jurors. (*Rowley* v. *Group Health Coop. of Puget Sound* (1976) 16 Wn.App. 373 [556 P.2d 250, 252-254] [member of health care cooperative].) In *McKernan* v. *Los Angeles Gas etc. Co.* (1911) 16 Cal.App. 280, 283 [116 P. 677]—perhaps

---

[3]Section 602 provides in relevant part: "Challenges for cause may be taken on one or more of the following grounds: . . . [¶] (4) Standing in the relation of . . . master and servant . . . or principal and agent, or debtor and creditor, to either party . . . . A depositor of a bank . . . shall not be deemed a creditor of such bank . . . for the purpose of this subsection solely by reason of his being such a depositor . . . [¶] . . . (6) Interest on the part of the juror in the event of the action, or in the main question involved in the action, except his interest as a member or citizen or taxpayer of a county, city and county, incorporated city or town, or other political subdivision of a county, or municipal water district."
As the above quotation demonstrates, section 602 by its terms establishes that two types of relationships—(1) the relationship of a bank depositor to a bank and (2) the relationship of a taxpayer to a governmental entity—do not justify a challenge for cause. The statute does not, however, state whether the designated exceptions are exclusive or illustrative.

the closest California case in point—the court indicated that the mere fact that some of the jurors were customers of the defendant utility company would not, in itself, mandate their excusal for cause.

■ But whether or not under California law membership in Kaiser rendered the prospective jurors excludable for cause under section 602, we believe that it is clear that the trial court's discharge of such members provides no basis for reversing the judgment in this case. To begin with, even if membership in Kaiser is not itself disqualifying, it is not apparent that the trial court abused the broad discretion it retains over the jury selection process (see, e.g., *Rousseau* v. *West Coast House Movers* (1967) 256 Cal.App.2d 878, 883-886 [64 Cal.Rptr. 655]) by excusing the members in this case. As its comments to the jury suggest, the court had apparently discovered through past experience that in this situation the individual voir dire procedure would prove very time-consuming and unproductive, with a substantial proportion of the Kaiser members ultimately being subject to challenge by one party or the other. Furthermore, the trial court may reasonably have felt that the process of conducting an extensive voir dire of all Kaiser members might itself prejudice prospective jurors who did not belong to Kaiser. From experience, it may have foreseen that such questioning would invariably involve the recounting of specific, potentially prejudicial incidents concerning the prospective jurors and Kaiser, as well as the exploration of the relative satisfaction or dissatisfaction with Kaiser of the particular jurors on this venire. Such matters would, of course, not be admissible in the actual trial of the case, and the court may have feared that such revelations on voir dire might "taint" all of the other prospective jurors in the courtroom. Under these circumstances, it cannot be said that the trial court abused its discretion in excusing the Kaiser members without individual examination.

Further, even if the trial court did err in this regard, the error clearly would not warrant reversal. This follows from the general rule that an erroneous exclusion of a juror for cause provides no basis for overturning a judgment. (See, e.g., *Asevado* v. *Orr* (1893) 100 Cal. 293, 300-301 [34 P. 777]; *McKernan* v. *Los Angeles Gas etc. Co., supra,* 16 Cal.App. 280, 283; 1 Cal. Civil Procedure During Trial (Cont.Ed.Bar 1982) § 7.41, p. 298.) As the court explained in *Dragovich* v. *Slosson* (1952) 110 Cal.App.2d 370, 371 [242 P.2d 945]: " 'Since a defendant or a party is not entitled to a jury composed of any particular jurors, the court may of its own motion discharge a qualified juror without committing any error, provided there is finally selected a jury composed of qualified and competent persons.' " ■ Although defendant attempts to fit this case within the proviso of the above rule—on the theory that the removal of the Kaiser members rendered the jury panel unconstitutionally nonrepresentative (cf.

*Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412] [exclusion of daily wage earners])—defendant points to no authority which even remotely supports its claim that Kaiser members are a "cognizable class," and the record in this case provides no evidence to suggest that this group has the kind of shared experiences, ideology or background that have been identified as the *sine qua non* of such a class. (See, e.g., *People* v. *Fields* (1983) 35 Cal.3d 329, 347-349 [197 Cal.Rptr. 803, 673 P.2d 680] [plurality opinion]; cf. *People* v. *White* (1954) 43 Cal.2d 740, 751 [278 P.2d 9] ["The system of jury selection primarily from the membership rosters of certain private clubs and organizations [such as the Lions, Rotary and the Chamber of Commerce] would normally tend to result in a systematic inclusion of a large proportion of business and professional people and a definite exclusion of certain classes such as ordinary working people."].) On this record, we cannot find that the jury that tried this matter was any less a cross-section of the community than it would have been had Kaiser members not been excused.

Accordingly, the manner in which the jury was selected provides no basis for reversing the judgment.

### III

■ Defendant next contends that the trial court misinstructed the jury on the standard of care by which Nurse Welch's conduct should be judged. In addition to the general BAJI instruction on the duty of care of a graduate nurse, the court told the jury that "the standard of care required of a nurse practitioner is that of a physician and surgeon . . . when the nurse practitioner is examining a patient or making a diagnosis."[4]

We agree with defendant that this instruction is inconsistent with recent legislation setting forth general guidelines for the services that may properly be performed by registered nurses in this state. Section 2725 of the Business and Professions Code, as amended in 1974, explicitly declares a legislative intent "to recognize the existence of overlapping functions between physicians and registered nurses and to permit additional sharing of functions

---

[4]The relevant instruction read in full: "It is the duty of one who undertakes to perform the service of a trained or graduate nurse to have the knowledge and skill ordinarily possessed, and to exercise the care and skill ordinarily used in like cases, by trained and skilled members of the nursing profession practicing their profession in the same or similar locality and under similar circumstances. Failure to fulfill either of these duties is negligence. [¶] I instruct you that the standard of care required of a nurse practitioner is that of a physician and surgeon duly licensed to practice medicine in the state of California when the nurse practitioner is examining a patient or making a diagnosis."

The initial paragraph of this instruction tracks BAJI No. 6.25; the second paragraph was an added instruction given at plaintiff's request.

within organized health care systems which provide for collaboration between physicians and registered nurses."[5] Section 2725 also includes, among the functions that properly fall within "the practice of nursing" in California, the "[o]bservation of signs and symptoms of illness, reactions to treatment, general behavior, or general physical condition, and . . . determination of whether such signs, symptoms, reactions, behavior or general appearance exhibit abnormal characteristics . . . ." In light of these provisions, the "examination" or "diagnosis" of a patient cannot in all circumstances be said—as a matter of law—to be a function reserved to physicians, rather than registered nurses or nurse practitioners.[6] Although plaintiff was certainly entitled to have the jury determine (1) whether defendant medical center was negligent in permitting a nurse practitioner to see a patient who exhibited the symptoms of which plaintiff complained and (2) whether Nurse Welch met the standard of care of a reasonably prudent nurse practitioner in conducting the examination and prescribing treatment in conjunction with her supervising physician, the court should not have told the jury that the nurse's conduct in this case must—as a matter of law—be measured by the standard of care of a physician or surgeon. (See *Fraijo* v. *Hartland Hospital* (1979) 99 Cal.App.3d 331, 340-344 [160 Cal.Rptr.

---

[5]Section 2725 currently provides in relevant part: "In amending this section at the 1973-74 session, the Legislature recognizes that nursing is a dynamic field, the practice of which is continually evolving to include more sophisticated patient care activities. It is the intent of the Legislature in amending this section at the 1973-74 session to provide clear legal authority for functions and procedures which have common acceptance and usage. It is the legislative intent also to recognize the existence of overlapping functions between physicians and registered nurses and to permit additional sharing of functions within organized health care systems which provide for collaboration between physicians and registered nurses. . . . [¶] The practice of nursing within the meaning of this chapter means those functions, including basic health care, which help people cope with difficulties in daily living which are associated with their actual or potential health or illness problems or the treatment thereof which require a substantial amount of scientific knowledge or technical skill, and includes all of the following: [¶] (a) Direct and indirect patient care services that insure the safety, comfort, personal hygiene, and protection of patients; and the performance of disease prevention and restorative measures. [¶] (b) Direct and indirect patient care services, including, but not limited to, the administration of medications and therapeutic agents, necessary to implement a treatment, disease prevention, or rehabilitative regimen ordered by and within the scope of licensure of a physician . . . [¶] (c) The performance of skin tests, immunization techniques, and the withdrawal of human blood from veins and arteries. [¶] (d) Observation of signs and symptoms of illness, reactions to treatment, general behavior, or general physical condition, and (1) determination of whether such signs, symptoms, reactions, behavior, or general appearance exhibit abnormal characteristics; and (2) implementation, based on observed abnormalities, of appropriate reporting, or referral, or standardized procedures, or changes in treatment regimen in accordance with standardized procedures, or the initiation of emergency procedures."

[6]In 1977, the Legislature adopted legislation specifically related to "nurse practitioners," providing that a "nurse practitioner" must be both a registered nurse and also meet the standards for nurse practitioner established by the Board of Registered Nursing. (See Bus. & Prof. Code, § 2834 et seq.) The evidence in this case established that Nurse Welch had been certified as both a registered nurse and a "family nurse practitioner."

246]. See generally Note, *A Revolution in White—New Approaches in Treating Nurses as Professionals* (1977) 30 Vand.L.Rev. 839, 871-879.)

But while the instruction was erroneous, it is not reasonably probable that the error affected the judgment in this case. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) As noted, several hours after Nurse Welch examined plaintiff and gave him the Valium that her supervising doctor had prescribed, plaintiff returned to the medical center with similar complaints and was examined by a physician, Dr. Redding. Although there was considerable expert testimony that the failure of the medication to provide relief and the continued chest pain rendered the diagnosis of muscle spasm more questionable, Dr. Redding—like Nurse Welch—failed to order an EKG. Given these facts, the jury could not reasonably have found Nurse Welch negligent under the physician standard of care without also finding Dr. Redding—who had more information and to whom the physician standard of care was properly applicable—similarly negligent. Defendant does not point to any evidence which suggests that the award in this case was affected by whether defendant's liability was grounded solely on the negligence of Dr. Redding, rather than on the negligence of both Dr. Redding and Nurse Welch, and, from our review of the record, we conclude that it is not reasonably probable that the instructional error affected the judgment.[7] Accordingly, the erroneous instruction on the standard of care of a nurse practitioner does not warrant reversal.

IV

Defendant also objects to several instructions on causation. ■ First, defendant contends that an instruction on concurrent causation[8]—though ac-

---

[7]The medical experts on both sides agreed that the major infarction probably occurred about nine hours after Dr. Redding's examination. While Dr. Swan did indicate that the chances of preventing or minimizing injury are improved by the earliest possible detection of an impending attack, he also testified that assuming plaintiff were still in the preinfarctive stage at the time of Dr. Redding's examination—an assumption shared by the defense experts—if an EKG had been performed at that time "the same happy outcome could have happened that we projected for the 4:15 intervention [i.e., diagnosis and treatment at the time of Nurse Welch's examination]."

Defendant never suggested to the jury that its verdict should be affected by whether it found only Dr. Redding, and not Nurse Welch, to have been negligent. Its position was simply that in light of the symptoms described and exhibited by plaintiff at the time of the examinations, neither Nurse Welch nor Dr. Redding was negligent in failing to order an EKG, and that, in any event, the heart attack could not have been prevented even if an EKG had been performed at either time.

[8]The instruction read: "There may be more than one proximate cause of an injury. When negligent conduct of two or more persons contributes concurrently as proximate causes of an injury, the conduct of each of said persons is a proximate cause of the injury regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury."

curately stating the law—should not have been given because Permanente was the only defendant in the case. As plaintiff points out, however, the evidence suggested that the alleged negligence of a number of different persons employed by Permanente may have contributed to the injury, and the instruction—worded in terms of the concurrent negligent conduct of more than one "person," not "defendant"—properly informed the jury that each alleged negligent act could be a proximate cause of the injury regardless of the extent to which other negligent acts also contributed to the result. Although the instruction might not have been strictly necessary, the court did not err in giving it.

■ Defendant also complains of another of the proximate cause instructions, which informed the jury that "[i]f the conduct of the defendant is a substantial factor in bringing about the injuries or damages to the plaintiff, the fact that the defendant neither foresaw nor should have foreseen the extent or nature of the injuries or damages, or the manner in which they occurred, does not prevent its conduct from being a proximate cause of such injuries or damages." This instruction simply informed the jury of the general rule that the unforeseeability *of the extent or nature of the specific harm* suffered by the plaintiff does not mean that the defendant's conduct was not a proximate cause of the injuries. (See, e.g., *Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 58-59 [192 Cal.Rptr. 857, 665 P.2d 947]. See generally 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 629, pp. 2911-2912 and cases cited.) Contrary to defendant's contention, this instruction is applicable whether or not there are concurrent tortfeasors. Furthermore, although defendant suggests that the jury could have interpreted the instruction to render it *strictly liable* for plaintiff's injuries— imposing liability on defendant even if its failure to have diagnosed (i.e., "foreseen") plaintiff's heart condition was not negligent—that suggestion ignores the context in which this instruction was given, as well as additional instructions which informed the jury that plaintiff's case depended upon a showing of negligence.[9] Taken as a whole, the instructions did not suggest that defendant could be held strictly liable.

---

[9]For example, just before reading the instructions on causation, the court read the following instructions: "A plaintiff who was injured as a proximate result of some negligent conduct on the part of a defendant is entitled to recover compensation for such injury from that defendant. [¶] Thus, *the plaintiff is entitled to a verdict in this case if you find, in accordance with my instructions: 1. That defendant was negligent; and 2. That such negligence was a proximate cause of injury to the plaintiff.*

"In this action, the plaintiff has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: 1. *The negligence of the defendant.* 2. That such negligence was the proximate cause of injury to plaintiff. 3. The nature and extent of plaintiff's damages. . . ." (Italics added.)

## V

■ Defendant next argues that the trial court erred in permitting the jury to award damages for the loss of earnings attributable to plaintiff's so-called "lost years," i.e., the period of time by which his life expectancy was diminished as a result of defendant's negligence. (See generally Fleming, *The Lost Years: A Problem in the Computation and Distribution of Damages* (1962) 50 Cal.L.Rev. 598 [hereafter *The Lost Years*].)

We believe that this was clearly a proper element of plaintiff's damages. As the United States Supreme Court explained in *Sea-Land Services, Inc.* v. *Gaudet* (1974) 414 U.S. 573, 594 [39 L.Ed.2d 9, 26, 9 S.Ct. 806]: "Under the prevailing American rule, a tort victim suing for damages for permanent injuries is permitted to base his recovery 'on his prospective earnings for the balance of his life expectancy at the time of his injury *undiminished by any shortening of that expectancy as a result of the injury.*' 2 Harper & James[, The Law of Torts (1956)] § 24.6, pp. 1293-1294 (emphasis in original)." (See also Rest.2d Torts, § 924, coms. d, e, pp. 525-526.)[10] Although, to our knowledge, the lost years issue has not been previously decided in California, recovery of such damages is consistent with the general rule permitting an award based on the loss of future earnings a plaintiff is likely to suffer "because of inability to work *for as long a period of time in the future as he could have done had he not sustained the accident.*" (Italics added.) (*Robison* v. *Atchison, Topeka & S. F. Ry. Co.* (1962) 211 Cal.App.2d 280, 288 [27 Cal.Rptr. 260].)

Contrary to defendant's contention, plaintiff's recovery of such future lost wages will not inevitably subject defendant to a "double payment" in the event plaintiff's heirs bring a wrongful death action at some point in the future. In *Blackwell* v. *American Film Co.* (1922) 189 Cal. 689, 700-702

---

[10]The comments in the Restatement state: "*d. Loss or impairment of earning capacity for the future.* The extent of future harm to the earning capacity of the injured person is measured by the difference, viewed as of the time of trial, between the value of the plaintiff's services as they will be in view of the harm and as they would have been had there been no harm. This difference is the resultant derived from reducing to present value the anticipated losses of earnings during the expected working period that the plaintiff would have had during the remainder of his prospective life, but for the defendant's act. (On the determination of the prospective length of life, see Comment *e.*) Accordingly, the trier of fact must ascertain, as nearly as can be done in advance, the difference between the earnings that the plaintiff would or could have received during his life expectancy but for the harm and the earnings that he will probably be able to receive during the period of his life expectancy as now determined. . . . [¶] *e. The determination of length of life.* In the case of permanent injuries or injuries causing death, it is necessary, in order to ascertain the damages, to determine the expectancy of the injured person's life at the time of the tort. . . . [¶] If the person harmed is alive at the time of trial, ordinarily the opinion of experts on the probable diminution of the plaintiff's life expectancy as a result of the tort is admissible as bearing upon the impairment of future earning capacity. . . ." (*Ibid.*)

[209 P. 999], we held that in a wrongful death case, a jury was properly instructed that in computing damages it should consider the amount the decedent had obtained from defendant in an earlier judgment as compensation for the impairment of his future earning capacity. Similarly, in the *Sea-Land Services* case, the Supreme Court recognized that an appropriate setoff may be made in the later wrongful death action. (*Sea-Land Services, Inc.* v. *Gaudet, supra,* 414 U.S. at pp. 592-594 & fn. 30 [39 L.Ed.2d at pp. 25-26].)

Defendant alternatively argues that the jury should have been instructed to deduct from plaintiff's prospective gross earnings of the lost years, the "saved" cost of necessities that plaintiff would not incur during that period. Although there is some authority to support the notion that damages for the lost years should be assessed on the basis of plaintiff's "net" loss (see *The Lost Years, supra,* 50 Cal.L.Rev. 598, 603 & fn. 23), we need not decide that issue in this case because defendant neither requested such an instruction at trial nor presented any evidence of anticipated cost savings that would have supported such an instruction. Under these circumstances, the trial court did not err in failing to instruct on the point. (See *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946].)

## VI

After the jury returned its verdict, defendant requested the trial court to enter a judgment—pursuant to section 667.7 of the Code of Civil Procedure—providing for the periodic payment of future damages, rather than a lump-sum award. Although the trial court rejected plaintiff's constitutional challenge to the periodic payment provision—a conclusion consistent with our recent decision in *American Bank*—it nonetheless denied defendant's request, interpreting section 667.7 as affording a trial court discretion in determining whether to enter a periodic payment judgment and concluding that on the facts of this case the legislative purpose of section 667.7 "would be defeated rather than promoted by ordering periodic payments rather than a lump sum award." Defendant contends that the trial court misinterpreted the statute and erred in failing to order periodic payment of all future damages.

■ We agree with defendant that the trial court was in error insofar as it interpreted section 667.7 as "discretionary" rather than "mandatory." The statute provides that "[i]n any [medical malpractice action], a superior court *shall,* at the request of either party, *enter a judgment ordering that money damages* or its equivalent *for future damages* of the judgment creditor *be paid in whole or in part by periodic payments rather than by a lump-*

*sum payment* if the award equals or exceeds fifty thousand dollars ($50,000) in future damages." (Italics added.)[11] Although in some contexts the use of the term "shall" may be consistent with a "discretionary" rather than a "mandatory" meaning (see, e.g., *Estate of Mitchell* (1942) 20 Cal.2d 48, 50-52 [123 P.2d 503]), the legislative history of section 667.7 leaves little doubt that here the Legislature intended to impose a mandatory duty on the trial court to enter a periodic payment judgment in cases falling within the four corners of the section.[12]

---

[11]Section 667.7 provides in relevant part: "(a) In any action for injury or damages against a provider of health care services, a superior court shall, at the request of either party, enter a judgment ordering that money damages or its equivalent for future damages of the judgment creditor be paid in whole or in part by periodic payments rather than by a lump-sum payment if the award equals or exceeds fifty thousand dollars ($50,000) in future damages. In entering a judgment ordering the payment of future damages by periodic payments, the court shall make a specific finding as to the dollar amount of periodic payments which will compensate the judgment creditor for such future damages. As a condition to authorizing periodic payments of future damages, the court shall require the judgment debtor who is not adequately insured to post security adequate to assure full payment of such damages awarded by the judgment. Upon termination of periodic payments of future damages, the court shall order the return of this security, or so much as remains, to the judgment debtor. [¶] (b)(1) The judgment ordering the payment of future damages by periodic payments shall specify the recipient or recipients of the payments, the dollar amount of the payments, the interval between payments, and the number of payments or the period of time over which payments shall be made. Such payments shall only be subject to modification in the event of the death of the judgment creditor. [¶] (2) In the event that the court finds that the judgment debtor has exhibited a continuing pattern of failing to make the payments, as specified in paragraph (1), the court shall find the judgment debtor in contempt of court and, in addition to the required periodic payments, shall order the judgment debtor to pay the judgment creditor all damages caused by the failure to make such periodic payments, including court costs and attorney's fees. [¶] (c) However, money damages awarded for loss of future earnings shall not be reduced or payments terminated by reason of the death of the judgment creditor, but shall be paid to persons to whom the judgment creditor owed a duty of support, as provided by law, immediately prior to his death. In such cases the court which rendered the original judgment, may, upon petition of any party in interest, modify the judgment to award and apportion the unpaid future damages in accordance with this subdivision. [¶] (d) Following the occurrence or expiration of all obligations specified in the periodic payment judgment, any obligation of the judgment debtor to make further payments shall cease and any security given, pursuant to subdivision (a) shall revert to the judgment debtor. . . . [¶] (f) It is the intent of the legislature in enacting this section to authorize the entry of judgments in malpractice actions against health care providers which provide for the payment of future damages through periodic payments rather than lump-sum payments. By authorizing periodic payment judgments, it is the further intent of the legislature that the courts will utilize such judgments to provide compensation sufficient to meet the needs of an injured plaintiff and those persons who are dependent on the plaintiff for whatever period is necessary while eliminating the potential windfall from a lump-sum recovery which was intended to provide for the care of an injured plaintiff over an extended period who then dies shortly after the judgment is paid, leaving the balance of the judgment award to persons and purposes for which it was not intended. It is also the intent of the Legislature that all elements of the periodic payment program be specified with certainty in the judgment ordering such payments and that the judgment not be subject to modification at some future time which might alter the specifications of the original judgment."

[12]As originally introduced, the bill which ultimately became section 667.7 provided that a trial court "may," and at the request of either party "shall," provide for periodic payments. (Assem. Bill No. 1 (1975-1976 Second Ex. Sess.) June 6, 1975, § 26.) Thereafter,

■ Nonetheless, for several reasons relating to the specific facts of this case, we conclude that the trial court judgment should not be reversed on this ground. To begin with, although the court formally rejected defendant's motion for a periodic payment order, its judgment did provide for the periodic payment of the damages which the jury awarded for plaintiff's future medical expenses, directing the defendant to pay such expenses "as [they] are incurred up to the amount of $63,000."

Second, with respect to the award of noneconomic damages, we find that defendant is in no position to complain of the absence of a periodic payment award. As noted, defendant did not move for a periodic payment award until after the jury had returned its special verdicts. Although the trial court had requested the jury to return a special verdict designating the total amount of its noneconomic damage award—to facilitate the application of Civil Code section 3333.2, whose constitutionality we discuss below—the jury was not instructed to designate the portion of the noneconomic damage award that was attributable to future damages, and it did not do so. Instead, it returned an undifferentiated special verdict awarding noneconomic damages of $500,000. Because of defendant's failure to raise the periodic payment issue earlier, plaintiff was deprived of the opportunity to seek a special verdict designating the amount of "future noneconomic damage." Furthermore, as we have seen, the trial court, acting pursuant to Civil Code section 3333.2, reduced the $500,000 noneconomic damage verdict to $250,000. Given the facts of this case, the $250,000 might well reflect the noneconomic damage sustained by plaintiff up until the time of the judgment. Under the circumstances, we conclude that the interests of justice would be served by affirming the lump-sum noneconomic damage award. (See *American Bank & Trust Co.* v. *Community Hospital, supra,* 36 Cal.3d 359, 378.)

Third and finally, there is the question of the $700,000 award for lost future earnings. Although in general lost future earnings are a type of future damage particularly suitable to a periodic payment judgment, this case presents a somewhat unusual situation because the damages awarded are solely attributable to the earnings of plaintiff's lost years. If the trial court had ordered such damages paid periodically over the time period when the loss was expected to be incurred, the damages would have been paid in their entirety *after* plaintiff's expected death, and thus—if the life expectancy predictions were accurate—plaintiff would not have received *any* of this element of damages. Had defendant presented evidence by which the jury

---

the bill was amended to provide simply that a court "may" provide for periodic payments. (Assem. Amend. to Assem. Bill No. 1 (1975-1976 Second Ex. Sess.) June 12, 1975, § 26.) Before enactment, however, the bill was again amended to delete the permissive "may" language and to insert the mandatory "shall" language that appears in the current statute. (Sen. Amend. to Assem. Bill No. 1 (1975-1976 Second Ex. Sess.) June 25, 1975, § 26.)

could have determined what proportion of the lost years' earnings would likely be spent for the support of plaintiff's dependents rather than plaintiff himself (see *The Lost Years, supra,* 50 Cal.L.Rev. 598, 613), and had it raised the periodic payment issue in a timely fashion so that the jury could have made special findings on that question, there might well be a strong argument that the dependents' share of the lost years' earnings should be subject to periodic payment. In the absence of any such apportionment, however, we conclude that the trial court properly determined that section 667.7 did not call for the periodic payment of this element of plaintiff's award.

Thus, in sum, we conclude that none of the defendant's contentions call for a reversal of the judgment.

## VII

We now turn to plaintiff's contentions.

As noted, although the jury by special verdict set plaintiff's noneconomic damages at $500,000, the trial court reduced that amount to $250,000 pursuant to Civil Code section 3333.2.[13] Plaintiff challenges this ruling, contending that section 3333.2 is unconstitutional on a number of grounds. In many respects, plaintiff's argument tracks the constitutional objections to other provisions of MICRA that we have recently rejected in *American Bank, Barme* and *Roa.*

■ We begin with the claim that section 3333.2 denies due process because it limits the potential recovery of medical malpractice claimants without providing them an adequate quid pro quo. In rejecting a similar challenge to the periodic payment provision at issue in *American Bank,* we explained that "[i]*t is well established that a plaintiff has no vested property right in a particular measure of damages, and that the Legislature possesses broad authority to modify the scope and nature of such damages.* (See, e.g., *Werner v. Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 129 [216 P.2d 825, 13 A.L.R.2d 252]; *Feckenscher v. Gamble* (1938) 12 Cal.2d 482, 499-500 [85 P.2d 885]; *Tulley v. Tranor* (1878) 53 Cal. 274, 280.) Since the demise of the substantive due process analysis of *Lochner v. New York* (1905) 198 U.S. 45 [49 L.Ed. 937, 25 S.Ct. 539], it has been clear that the constitutionality of measures affecting such economic rights under the due

---

[13]Section 3333.2 provides in relevant part: "(a) In any [medical malpractice] action . . . the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage. [¶] (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)."

process clause does not depend on a judicial assessment of the justifications for the legislation or of the wisdom or fairness of the enactment [i.e., the "adequacy" of the quid pro quo]. So long as the measure is rationally related to a legitimate state interest, policy determinations as to the need for, and the desirability of, the enactment are for the Legislature." (Italics added.) (*American Bank, supra,* 36 Cal.3d 359, 368-369.)

It is true, of course, that section 3333.2 differs from the periodic payment provision in *American Bank* inasmuch as the periodic payment provision— in large measure—simply postpones a plaintiff's receipt of damages whereas section 3333.2 places a dollar limit on the amount of noneconomic damages that a plaintiff may obtain.[14] That difference, however, does not alter the applicable due process standard of review. As our language in *American Bank* itself suggests, our past cases make clear that the Legislature retains broad control over *the measure,* as well as *the timing,* of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and that the Legislature may expand or limit recoverable damages so long as its action is rationally related to a legitimate state interest. In *Werner v. Southern Cal. etc. Newspapers, supra,* 35 Cal.2d 121, for example, our court applied the "rational relationship" standard in dismissing a due process attack on a statute—Civil Code section 48a—which permitted a plaintiff who brought a libel or slander action against a newspaper generally to obtain only "special damages," largely eliminating the traditional right to obtain "general damages" that such a plaintiff had enjoyed before the statute.[15]

In light of our discussion of the legislative history and purposes of MICRA in *American Bank, Barme* and *Roa,* it is clear that section 3333.2 is rationally related to legitimate state interests. As we explained in those decisions, in enacting MICRA the Legislature was acting in a situation in which it had found that the rising cost of medical malpractice insurance was posing serious problems for the health care system in California, threatening to curtail the availability of medical care in some parts of the state and creating the very real possibility that many doctors would practice without insurance, leaving patients who might be injured by such doctors with the prospect of uncollectible judgments. In attempting to reduce the cost of

---

[14]One feature of the periodic payment provision upheld in *American Bank*—terminating payments for future damages, other than damages for loss of earnings, on the plaintiff's death—clearly does operate to reduce the amount of damages ultimately recovered.

[15]The "general damage/special damage" distinction drawn by section 48a is similar to the "noneconomic damage/economic damage" distinction established by section 3333.2. Section 48a defines "general damages" as "damages for loss of reputation, shame, mortification and hurt feelings" and defines "special damages" as "all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other."

medical malpractice insurance in MICRA, the Legislature enacted a variety of provisions affecting doctors, insurance companies and malpractice plaintiffs.

Section 3333.2, like the sections involved in *American Bank, Barme* and *Roa,* is, of course, one of the provisions which made changes in existing tort rules in an attempt to reduce the cost of medical malpractice litigation, and thereby restrain the increase in medical malpractice insurance premiums. It appears obvious that this section—by placing a ceiling of $250,000 on the recovery of noneconomic damages—is rationally related to the objective of reducing the costs of malpractice defendants and their insurers.

There is no denying, of course, that in some cases—like this one—section 3333.2 will result in the recovery of a lower judgment than would have been obtained before the enactment of the statute. It is worth noting, however, that in seeking a means of lowering malpractice costs, the Legislature *placed no limits whatsoever on a plaintiff's right to recover for all of the economic, pecuniary damages—such as medical expenses or lost earnings— resulting from the injury,* but instead confined the statutory limitations to the recovery of *noneconomic damages,* and—even then—permitted up to a $250,000 award for such damages. Thoughtful jurists and legal scholars have for some time raised serious questions as to the wisdom of awarding damages for pain and suffering in any negligence case, noting, inter alia, the inherent difficulties in placing a monetary value on such losses, the fact that money damages are at best only imperfect compensation for such intangible injuries and that such damages are generally passed on to, and borne by, innocent consumers.[16] While the general propriety of such damages is, of course, firmly imbedded in our common law jurisprudence (see, e.g., *Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893 [103 Cal.Rptr. 856, 500 P.2d 880]), no California case of which we are aware has ever suggested that the right to recover for such noneconomic

---

[16]Justice Traynor, in a dissenting opinion in *Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 511 [15 Cal.Rptr. 161, 364 P.2d 337], observed: "There has been forceful criticism of the rationale for awarding damages for pain and suffering in negligence cases. (Morris, *Liability for Pain and Suffering,* 59 Columb.L.Rev. 476; Plant, *Damages for Pain and Suffering,* 19 Ohio L.J. 200; Jaffe, *Damages for Personal Injury: The Impact of Insurance,* 18 Law & Contemp. Probs. 219; Zelermyer, *Damages for Pain and Suffering,* 6 Syracuse L.Rev. 27.) Such damages originated under primitive law as a means of punishing wrongdoers and assuaging the feelings of those who had been wronged. [Citations.] They become increasingly anomalous as emphasis shifts in a mechanized society from ad hoc punishment to orderly distribution of losses through insurance and the price of goods or of transportation. Ultimately such losses are borne by a public free of fault as part of the price for the benefits of mechanization. [Citations.] [¶] Nonetheless, this state has long recognized pain and suffering as elements of damages in negligence cases [citations]; *any change in this regard must await reexamination of the problem by the Legislature.*" (Italics added.)

injuries is constitutionally immune from legislative limitation or revision. (See, e.g., *Werner* v. *Southern Cal. etc. Newspapers, supra,* 35 Cal.2d 121, 126-128; fn. 15, *ante.* See generally Morris, *Liability for Pain and Suffering* (1959) 59 Colum.L.Rev. 476 [urging legislative revision of rules relating to damages for pain and suffering].)

Faced with the prospect that, in the absence of some cost reduction, medical malpractice plaintiffs might as a realistic matter have difficulty collecting judgments for *any* of their damages—pecuniary as well as nonpecuniary—the Legislature concluded that it was in the public interest to attempt to obtain some cost savings by limiting noneconomic damages. Although reasonable persons can certainly disagree as to the wisdom of this provision,[17] we cannot say that it is not rationally related to a legitimate state interest.[18]

---

[17]In its comprehensive report on the medical malpractice insurance crisis, the American Bar Association's Commission on Medical Professional Liability recommended that no dollar limit be imposed on recoveries for economic loss, but expressly "[took] no position on whether it is appropriate to place a ceiling on the recovery of non-economic loss." (Rep. of Com. on Medical Professional Liability (1977) 102 ABA Ann.Rep. 786, 849.) The commission explained its conclusions as follows: "When liability has been demonstrated, the first priority of the tort system is to compensate the injured party for the economic loss he has suffered. While it is legitimate in the Commission's view to deduct payments to or for the benefit of the plaintiff by collateral sources, it is unconscionable to preclude a plaintiff, by an arbitrary ceiling on recovery, from recovering all his economic damages, even though some lowering of medical malpractice premiums may result from the enactment of such a ceiling. [¶] The Commission has taken no position, however, on whether it is appropriate to place a statutory ceiling on the recovery of non-economic loss. The arguments in favor of limiting non-economic loss are that a ceiling on general damages would contain jury awards within realistic limits, reduce the exposure of insurers (which reductions could be reflected in lowered premiums), lead to more settlements and less litigation, and enable insurance carriers to set more accurate rates because of the greater predictability of the size of judgments. [¶] The arguments against limiting non-economic loss are that medical malpractice should not be distinguished from other areas of professional malpractice or personal injury actions which have no ceiling on general damages, that general damages are as real to the plaintiff as economic loss, that a wrongdoer should pay for all the losses he has caused, including pain and suffering, and that the general damages portion of an award provides a fund out of which the plaintiff's attorney's fees can be deducted without leaving the plaintiff economically undercompensated. In addition, it is argued that no immediate cost or premium savings will be generated by a ceiling on non-economic losses because questions regarding the constitutionality of such statutes would have to be finally resolved before the insurance companies would reflect any potential savings in their rates; and because the ceiling might prove to be the norm." (*Ibid.*)

[18]Indeed, even if due process principles required some "quid pro quo" to support the statute, it would be difficult to say that the preservation of a viable medical malpractice insurance industry in this state was not an adequate benefit for the detriment the legislation imposes on malpractice plaintiffs. As the United States Supreme Court observed in upholding the provisions of the Price-Anderson Act which placed a dollar limit on total liability that would be incurred by a defendant in the event of a nuclear accident: " 'It should be emphasized . . . that it is collecting a judgment, not filing a lawsuit, that counts. . . . [A] defendant with theoretically 'unlimited' liability may be unable to pay a judgment once obtained.' "

A number of state courts have invalidated statutory provisions limiting damages in medical malpractice actions on a variety of theories (see, e.g., *Wright* v. *Central Du Page Hospital Assn.* (1976) 63 Ill.2d 313 [347 N.E.2d 736, 80 A.L.R.3d 566]; *Arneson* v. *Olson* (N.D. 1978) 270 N.W.2d 125, 135-136; *Carson* v. *Maurer* (N.H. 1980) 120 N.H. 925 [424 A.2d 825, 836-838, 12 A.L.R.4th 1]; *Baptist Hosp. of Southeast Texas* v. *Baber* (Tex.Ct.App. 1984) 672 S.W.2d 296, 297-298); others have upheld such limitations. (See, e.g., *Johnson* v. *St. Vincent Hospital, Inc.* (1980) 273 Ind. 374 [404 N.E.2d 585, 600-601]; *Prendergast* v. *Nelson* (1977) 199 Neb. 97 [256 N.W.2d 657, 668-672] [plurality opinion].) With only one exception, all of the invalidated statutes contained a ceiling which applied to both pecuniary and nonpecuniary damages, and several courts—in reaching their decisions—were apparently considerably influenced by the potential harshness of a limit that might prevent an injured person from even recovering the amount of his medical expenses. (See *Anderson* v. *Wagner* (1979) 79 Ill.2d 295 [402 N.E.2d 560, 564] [explaining decision in *Wright, supra,* 347 N.E.2d 736]; *Arneson* v. *Olson, supra,* 270 N.W.2d 125, 135.)[19] Section 3333.2, of course, could have no such effect. In any event, as we have explained, we know of no principle of California—or federal— constitutional law which prohibits the Legislature from limiting the recovery of damages in a particular setting in order to further a legitimate state interest. (See, e.g., *Cory* v. *Shierloh* (1981) 29 Cal.3d 430, 437-440 [174 Cal.Rptr. 500, 629 P.2d 8] [upholding statute eliminating liability of persons who provide alcohol to drunk driver]; *Duke Power Co.* v. *Carolina Env. Study Group, supra,* 438 U.S. 59 [upholding statutory limit on liability in the event of a nuclear accident].) Accordingly, we conclude that section 3333.2 does not violate due process.

Plaintiff alternatively contends that the section violates the equal protection clause, both because it impermissibly discriminates between medical malpractice victims and other tort victims, imposing its limits only in medical malpractice cases, and because it improperly discriminates within the class of medical malpractice victims, denying a "complete" recovery of

---

(*Duke Power Co.* v. *Carolina Env. Study Group* (1978) 438 U.S. 59, 89-90 [57 L.Ed.2d 595, 621, 98 S.Ct. 2620] [quoting from legislative history].)

Although we do not suggest that the Legislature felt that section 3333.2 alone—or for that matter any other single provision of MICRA—was essential to the survival of the medical malpractice insurance system, there is surely nothing in the due process clause which prevents a legislature from making a number of statutory changes which, in combination, provide the requisite benefit to justify the enactment.

[19]The one exception is *Carson* v. *Maurer, supra,* 424 A.2d 825, in which the New Hampshire court struck down a provision which imposed a limit only on noneconomic damages, a statute apparently modeled on section 3333.2. As we noted in *Roa, supra* (37 Cal.3d at p. 932, fn. 9), the *Carson* court—in invalidating a variety of provisions of its medical malpractice legislation—applied an "intermediate scrutiny" standard of review that is inconsistent with the standard applicable in this state.

damages only to those malpractice plaintiffs with noneconomic damages exceeding $250,000.

█ With respect to the first contention, it should be evident from what we have already said that the Legislature limited the application of section 3333.2 to medical malpractice cases because it was responding to an insurance "crisis" in that particular area and that the statute is rationally related to the legislative purpose. *American Bank, Barme* and *Roa* make clear that under these circumstances, plaintiff's initial equal protection claim has no merit. (See *American Bank, supra,* 36 Cal.3d 359, 370-374; *Barme, supra,* 37 Cal.3d 174, 181-182; *Roa, supra,* 37 Cal.3d 920, 930-931.)

█ As for the claim that the statute violates equal protection because of its differential effect within the class of malpractice plaintiffs, the constitutional argument is equally unavailing. First, as we have already explained, the Legislature clearly had a reasonable basis for drawing a distinction between economic and noneconomic damages, providing that the desired cost savings should be obtained only by limiting the recovery of noneconomic damage. (See pp. 159-160, *ante.*) The equal protection clause certainly does not require the Legislature to limit a victim's recovery for out-of-pocket medical expenses or lost earnings simply because it has found it appropriate to place some limit on damages for pain and suffering and similar noneconomic losses. (See, e.g., *Werner* v. *Southern Cal. etc. Newspapers, supra,* 35 Cal.2d 121, 126-128.)

Second, there is similarly no merit to the claim that the statute violates equal protection principles because it obtains cost savings through a $250,000 limit on noneconomic damages, rather than, for example, through the complete elimination of all noneconomic damages. Although plaintiff and a supporting amicus claim that the $250,000 limit on noneconomic damages is more invidious—from an equal protection perspective—than a complete abolition of such damages on the ground that the $250,000 limit falls more heavily on those with the most serious injuries, if that analysis were valid a complete abolition of damages would be equally vulnerable to an equal protection challenge, because abolition obviously imposes greater monetary losses on those plaintiffs who would have obtained larger damage awards than on those who would have recovered lesser amounts. Just as the complete elimination of a cause of action has never been viewed as invidiously discriminating within the class of victims who have lost the right to sue, the $250,000 limit—which applies to all malpractice victims—does not amount to an unconstitutional discrimination.

Nor can we agree with amicus' contention that the $250,000 limit is unconstitutional because the Legislature could have realized its hoped-for cost

savings by mandating a fixed-percentage reduction of all noneconomic damage awards. The choice between reasonable alternative methods for achieving a given objective is generally for the Legislature, and there are a number of reasons why the Legislature may have made the choice it did. One of the problems identified in the legislative hearings was the unpredictability of the size of large noneconomic damage awards, resulting from the inherent difficulties in valuing such damages and the great disparity in the price tag which different juries placed on such losses. The Legislature could reasonably have determined that an across-the-board limit would provide a more stable base on which to calculate insurance rates. Furthermore, as one amicus suggests, the Legislature may have felt that the fixed $250,000 limit would promote settlements by eliminating "the unknown possibility of phenomenal awards for pain and suffering that can make litigation worth the gamble." Finally, the Legislature simply may have felt that it was fairer to malpractice plaintiffs in general to reduce only the very large noneconomic damage awards, rather than to diminish the more modest recoveries for pain and suffering and the like in the great bulk of cases. Each of these grounds provides a sufficient rationale for the $250,000 limit.

In light of some of the dissent's comments, one additional observation is in order. Contrary to the dissent's assertion, our application of equal protection principles in *American Bank, Barme, Roa* and this case is not inconsistent with the principles enunciated in *Brown* v. *Merlo* (1973) 8 Cal.3d 855 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505], *Cooper* v. *Bray* (1978) 21 Cal.3d 841 [148 Cal.Rptr. 148, 582 P.2d 604], or like cases. ■ As *Cooper* explains, under the traditional, rational relationship equal protection standard, what is required is that the court " 'conduct "*a serious and genuine judicial inquiry* into the correspondence between the classification and the legislative goals." ' " (21 Cal.3d at p. 848 [quoting *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 (139 Cal.Rptr. 620, 566 P.2d 254), italics added in *Cooper*].) We have conducted such an inquiry in all of these cases, and have found that the statutory classifications are rationally related to the "realistically conceivable legislative purpose[s]" (*Cooper, supra,* 21 Cal.3d at p. 851) of MICRA. We have not invented fictitious purposes that could not have been within the contemplation of the Legislature (see *Brown* v. *Merlo, supra,* 8 Cal.3d at p. 865, fn. 7) nor ignored the disparity in treatment which the statute in realistic terms imposes. (*Id.* at p. 862.) But *Brown* and *Cooper* have never been interpreted to mean that we may properly strike down a statute simply because we disagree with the wisdom of the law or because we believe that there is a fairer method for dealing with the problem. (See *Cory* v. *Shierloh, supra,* 29 Cal.3d 430, 437-439.) Our recent decisions do not reflect our support for the challenged provisions of MICRA as a matter of policy, but simply our conclusion that under established constitutional principles the Legisla-

ture had the authority to adopt such measures. As Justice Traynor explained in *Werner* v. *Southern Cal. etc. Newspapers, supra,* 35 Cal.2d 121, 129: "[A] court cannot eliminate measures which do not happen to suit its tastes if it seeks to maintain a democratic system. The forum for the correction of ill-considered legislation is a responsive legislature."

Accordingly, we conclude that section 3333.2 is constitutional. The trial court did not err in reducing the noneconomic damage award pursuant to its terms.

## VIII

For similar reasons, plaintiff's constitutional challenge to Civil Code section 3333.1—which modifies this state's common law "collateral source" rule—is also without merit.

■ Under the traditional collateral source rule, a jury, in calculating a plaintiff's damages in a tort action, does not take into consideration benefits—such as medical insurance or disability payments—which the plaintiff has received from sources other than the defendant—i.e., "collateral sources"—to cover losses resulting from the injury. (See, e.g., *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398].) Section 3333.1 alters this rule in medical malpractice cases.[20] Under section 3333.1, subdivision (a), a medical malpractice defendant is permitted to introduce evidence of such collateral source benefits received by or payable to the plaintiff; when a defendant chooses to introduce such evidence, the plaintiff may introduce evidence of the amounts he has paid—in insurance premiums, for example—to secure the benefits. Although section 3333.1, subdivision (a)—as ultimately adopted—does not specify how the jury should use such evidence, the Legislature apparently assumed that in most cases the jury would set plaintiff's damages

---

[20]Section 3333.1 provides in relevant part: "(a) In the event the defendant so elects, in an action for personal injury against a health care provider based upon professional negligence, he may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services. Where the defendant elects to introduce such evidence, the plaintiff may introduce evidence of any amount which the plaintiff has paid or contributed to secure his right to any insurance benefits concerning which the defendant has introduced evidence. [¶] (b) No source of collateral benefits introduced pursuant to subdivision (a) shall recover any amount against the plaintiff nor shall it be subrogated to the rights of the plaintiff against a defendant."

at a lower level because of its awareness of plaintiff's "net" collateral source benefits.[21]

In addition, section 3333.1, subdivision (b) provides that whenever such collateral source evidence is introduced, the source of those benefits is precluded from obtaining subrogation either from the plaintiff or from the medical malpractice defendant. As far as the malpractice plaintiff is concerned, subdivision (b) assures that he will suffer no "double deduction" from his tort recovery as a result of his receipt of collateral source benefits; because the jury that has learned of his benefits may reduce his tort award by virtue of such benefits, the Legislature eliminated any right the collateral source may have had to obtain repayment of those benefits from the plaintiff. As for the malpractice defendant, subdivision (b) assures that any reduction in malpractice awards that may result from the jury's consideration of the plaintiff's collateral source benefits will inure to its benefit rather than to the benefit of the collateral source.

In our recent case of *Barme* v. *Wood, supra,* 37 Cal.3d 174, we addressed a constitutional challenge to section 3333.1, subdivision (b) brought by a "collateral source" whose subrogation rights against a malpractice defendant had been eliminated by the statute. In upholding the section's constitu-

---

[21]As we noted in *Barme* (37 Cal.3d at p. 179, fn. 5): "Earlier drafts of section 3333.1, subdivision (a) required the trier of fact to deduct such collateral source benefits in computing damages, but—as enacted—subdivision (a) simply provides for the admission of evidence of such benefits, apparently leaving to the trier of fact the decision as to how such evidence should affect the assessment of damages."

In this case, it is not clear from the record whether the parties and the trial court recognized that section 3333.1, subdivision (a) simply authorizes the reduction of damages on the basis of collateral source benefits, but does not specifically mandate such a reduction. As noted earlier (see p. 146, fn. 2, *ante*), after rejecting plaintiff's pretrial constitutional challenge to this statute, the trial court indicated that in order to avoid any confusion of the jury and because the amount of collateral source benefits was not in dispute, the evidence would not be admitted at trial and the court would simply reduce the jury award by the amount of such benefits. Plaintiff did not object to this procedure and raises no claim with respect to this aspect of the court's ruling on appeal.

Plaintiff does raise a minor contention, however, which is somewhat related to this matter. In awarding damages applicable to plaintiff's future medical expenses, the trial court indicated that defendant was to pay the first $63,000 of such expenses *that were not covered by employer-provided medical insurance.* Plaintiff, pointing out that he may not be covered by medical insurance in the future, apparently objects to any reduction of future damages on the basis of potential future collateral source benefits. Under the terms of the trial court's judgment, however, defendant's liability for such damages will be postponed only if plaintiff does in fact receive such collateral benefits; thus, it is difficult to see how plaintiff has any cause to complain about this aspect of the award. Indeed, if anything, the trial court may have given plaintiff more than he was entitled to, since it did not reduce the jury's $63,000 award by the collateral source benefits plaintiff was likely to receive, but instead imposed a continuing liability on defendant to pay up to a total of $63,000 for any noncovered medical expenses that plaintiff may incur in the future as a result of the injury. Defendant has not objected to this portion of the judgment.

tionality, we explained that a collateral source has no vested due process right to subrogation and that section 3333.1, subdivision (b) is rationally related to the purposes of MICRA since it reduces the costs imposed on medical malpractice defendants by shifting some of the costs in the area to other insurers.

This case is not controlled by *Barme,* because here plaintiff challenges the validity of subdivision (a), rather than subdivision (b), and contends that the statute violates the rights of a malpractice plaintiff, rather than the rights of a collateral source. Nonetheless, plaintiff's constitutional challenge is still without merit.

■ Again, we begin with the due process objections to the statute. Although, by its terms, subdivision (a) simply adds a new category of evidence that is admissible in a medical malpractice action, we recognize that in reality the provision affects the measure of a plaintiff's damage award, permitting the jury to reduce an award on the basis of collateral source benefits of which—but for the statute—the jury would be unaware. Nonetheless, as we have already explained in our discussion of section 3333.2, a plaintiff has no vested property right in a particular measure of damages. Thus, the fact that the section may reduce a plaintiff's award does not render the provision unconstitutional so long as the measure is rationally related to a legitimate state interest.

Because section 3333.1, subdivision (a) is likely to lead to lower malpractice awards, there can be no question but that this provision—like section 3333.2—directly relates to MICRA's objective of reducing the costs incurred by malpractice defendants and their insurers. And, as we have seen, the Legislature could reasonably have determined that the reduction of such costs would serve the public interest by preserving the availability of medical care throughout the state and by helping to assure that patients who were injured by medical malpractice in the future would have a source of medical liability insurance to cover their losses.

Moreover, the Legislature clearly did not act irrationally in choosing to modify the collateral source rule as one means of lowering the costs of malpractice litigation. In analyzing the collateral source rule more than a decade ago in *Helfend* v. *Southern Cal. Rapid Transit District, supra,* 2 Cal.3d 1, we acknowledged that most legal commentators had severely criticized the rule for affording a plaintiff a "double recovery" for "losses" he

had not in reality sustained,[22] and we noted that many jurisdictions had either restricted or repealed it. (*Id.*, at pp. 6-7, & fns. 4, 5 & 6.) Although we concluded in *Helfend* that a number of policy considerations counseled against judicial abolition of the rule, we in no way suggested that it was immune from legislative revision, but, on the contrary, stated that the changes proposed by legal commentators "if desirable, would be more effectively accomplished through legislative reform." (*Id.*, at p. 13.) In the mid-1970's, California was only one of many states to include a modification of the collateral source rule as a part of its medical malpractice reform legislation (see Comment, *An Analysis of State Legislative Responses to the Medical Malpractice Crisis* (1975) Duke L.J. 1417, 1447-1450), and the American Bar Association's Commission on Medical Professional Liability also recommended abolition of the rule as one appropriate response to the medical malpractice "crisis." (See Rep. of Com. on Medical Professional Liability, *supra,* 102 ABA Ann. Rep. 786, 849-850.) Under the circumstances, we think it is clear that the provision is rationally related to a legitimate state interest and does not violate due process.

Plaintiff's equal protection challenge to section 3333.1 is equally without merit. As with all of the MICRA provisions that we have examined in recent cases, the Legislature could properly restrict the statute's application to medical malpractice cases because the provision was intended to help meet problems that had specifically arisen in the medical malpractice field.

Accordingly, the trial court did not err in upholding section 3333.1.[23]

## IX

The judgment is affirmed. Each party shall bear its own costs on appeal.

Broussard, J., Grodin, J., and Lucas, J., concurred.

**BIRD, C. J.,** Dissenting.—With today's decision, a majority of this court have upheld, in piecemeal fashion, statutory provisions that require victims

---

[22]See, e.g., 2 Harper and James, The Law of Torts (1968 Supp.) section 25.22, at page 52; Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law* (1966) 54 Cal.L.Rev. 1478; James, *Social Insurance and Tort Liability: The Problem of Alternative Remedies* (1952) 27 N.Y.U.L.Rev. 537; Schwartz, *The Collateral Source Rule* (1961) 41 B.U.L.Rev. 348; West, *The Collateral Source Rule Sans Subrogation: A Plaintiff's Windfall* (1963) 16 Okla.L.Rev. 395; Note, *Unreason in the Law of Damages: The Collateral Source Rule* (1964) 77 Harv.L.Rev. 741.

[23]The majority of out-of-state cases that have passed on the issue have upheld the validity of provisions modifying the collateral source rule in medical malpractice cases. (See, e.g., *Eastin* v. *Broomfield* (1977) 116 Ariz. 576 [570 P.2d 744, 751-753]; *Rudolph* v. *Iowa Methodist Medical Ctr.* (Iowa 1980) 293 N.W.2d 550, 557-560; *Pinillos* v. *Cedars of Lebanon Hospital Corp.* (Fla. 1981) 403 So.2d 365, 367-368. Contra, *Carson* v. *Maurer, supra,* 424 A.2d 825, 835-836.)

of medical negligence to accept delayed payment of their judgments (*American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359 [204 Cal.Rptr. 671, 683 P.2d 670] [hereafter *American Bank*]), that prohibit them from paying the market rate for legal representation (*Roa* v. *Lodi Medical Group* (1985) 37 Cal.3d 920 [211 Cal.Rptr. 77, 695 P.2d 164]), that deprive them of compensation for proven noneconomic damages greater than $250,000 (maj. opn., *ante,* at pp. 157-164), and that divest them of the benefit of their own insurance policies (*id.,* at pp. 164-167).

While the majority have considered the cumulative *financial* effect of these provisions *on insurers* to support their conclusion that MICRA might have some desirable impact on insurance rates (see maj. opn., *ante,* at p. 159, fn. 16), they have insisted upon assessing the *human* impact of each provision *on injured victims* in isolation. However, it is no longer possible to ignore the overall pattern of the MICRA scheme. In order to provide special relief to negligent healthcare providers and their insurers, MICRA arbitrarily singles out a few injured patients to be stripped of important and well-established protections against negligently inflicted harm.

Crisis or no crisis, this court is dutybound to apply the constitutional guarantee against irrational and invidious legislative classifications. Today's majority opinion represents a sad departure from this court's previously proud tradition of fulfilling that important duty.

By now, the story of MICRA is a familiar one. (See generally, *American Bank, supra,* 36 Cal.3d at p. 364.) Enacted in 1975 amidst a nationwide "medical malpractice crisis," it includes a number of provisions that seek to relieve healthcare providers and their insurers from some of the costs of medical malpractice litigation. Victims of medical negligence—especially those afflicted with severe injuries—have been singled out to provide the bulk of this relief. These plaintiffs have been deprived of the benefit of various general rules that normally govern personal injury litigation. (See, e.g., Code Civ. Proc., § 667.7 [exception to general rule requiring immediate lump sum payment of a judgment]; Bus. & Prof. Code, § 6146 [special restrictions on attorney fees]; Civ. Code, § 3333.2 [special limit on non-economic damages];[1] § 3333.1 [abrogation of collateral source rule].)

As political scientist Paul Starr has observed, "[a] crisis can be a truly marvelous mechanism for the withdrawal or suspension of established rights, and the acquisition and legitimation of new privileges." (Quoted in Jenkins & Schweinfurth, *California's Medical Injury Compensation Reform Act: An Equal Protection Challenge* (1979) 52 So.Cal. L.Rev. 829, 935

---

[1]Henceforth, all statutory references are to the Civil Code unless otherwise specified.

[hereafter *California's MICRA*.) However, now that the medical malpractice "crisis" is fading into the past, courts around the country are taking a closer look at medical malpractice legislation. At the time of this court's first MICRA decision, only three courts had invalidated medical malpractice legislation on equal protection grounds. (*American Bank, supra,* 36 Cal.3d at p. 370, fn. 10.) In the past year alone, that number has doubled. (See *Austin* v. *Litvak* (Colo. 1984) 682 P.2d 41; *Baptist Hosp. of Southeast Texas* v. *Baber* (Tex.Ct.App. 1984) 672 S.W.2d 296; *Kenyon* v. *Hammer* (1984) 142 Ariz. 69 [688 P.2d 961].)

Unfortunately, a majority of this court today decline to join this growing trend. Instead, they continue to defer to the Legislature's resolution of the "crisis," with dire consequences both for victims of medical negligence and for well-established principles of constitutional law.

The problems of this approach are rapidly becoming apparent as the courts begin to confront its human consequences. Less than one year ago, this court rejected the first MICRA challenge, upholding the periodic payment provision. (See *American Bank, supra,* 36 Cal.3d 359.) Already, that provision has been severely limited. In *American Bank* itself, this court mandated special procedures to offset the provision's worst effects (*id.,* at pp. 376, 377, fn. 14) and declined to apply it to the case at bar. (*Id.,* at p. 378.) Today, in "the interests of justice," this court approves the trial court's refusal to apply the provision to all but a small portion of the present plaintiff's award. (Maj. opn., *ante,* at p. 156.)

While the majority have upheld the various provisions of MICRA out of deference to the Legislature, it is unlikely that such *ad hoc* judicial adjustments to the act will ultimately produce a result that is more respectful of the Legislature than a clear-cut constitutional invalidation followed by a *legislative* revision of the scheme. The majority's well meaning attempt at "deference" serves only to perpetuate a fundamentally unjust statutory scheme.

## I.

For the first time, this court is confronted with a provision of MICRA that directly prohibits plaintiffs from recovering compensation for proven injuries. In contrast to the provisions so far upheld by this court, there is no pretense that the $250,000 limit on noneconomic damages affects only windfalls (compare *American Bank, supra,* 36 Cal.3d at p. 369), that it protects plaintiffs' awards (compare *ibid.; Roa* v. *Lodi Medical Group, supra,* 37 Cal.3d at p. 933), or that it discourages nonmeritorious suits (com-

pare *id.*, at p. 932.) The statute plainly and simply denies severely injured malpractice victims compensation for negligently inflicted harm.

Also for the first time, the weight of authority from other jurisdictions *supports* the constitutional challenge. A substantial majority of the courts of the nation that have addressed the constitutionality of medical malpractice damage limits have *invalidated* the challenged provisions. (See *Wright* v. *Central Du Page Hospital Association* (1976) 63 Ill.2d 313 [347 N.E.2d 736, 743, 80 A.L.R.3d 566]; *Carson* v. *Maurer* (1980) 120 N.H. 925 [424 A.2d 825, 838, 12 A.L.R.4th 1] [hereafter *Carson*]; *Arneson* v. *Olson* (N.D. 1978) 270 N.W.2d 125, 136; *Baptist Hosp. of Southeast Texas* v. *Baber, supra,* 672 S.W.2d at p. 298; *Simon* v. *St. Elizabeth Medical Center* (1976) 3 Ohio Ops.3d 164 [355 N.E.2d 903, 906-907] [dictum]; cf. *Jones* v. *State Board of Medicine* (1976) 97 Idaho 859 [555 P.2d 399, 416], cert. den., 431 U.S. 914 [53 L.Ed.2d 223, 97 S.Ct. 2173] [remanding for factual determination on whether a medical malpractice crisis actually existed]; but see *Johnson* v. *St. Vincent Hospital, Inc.* (1980) 273 Ind. 374 [404 N.E.2d 585, 601].)

In *Carson, supra,* 424 A.2d at page 838, the New Hampshire Supreme Court struck down a damage limit identical to the present one. The court explained that "[i]t is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation." (*Id.,* at p. 837.)[2]

The majority suggest that, with the exception of *Carson*, the decisions of other jurisdictions are factually distinguishable from the present case. It is argued that the invalidated statutes were more oppressive than the present one since they restricted recovery for all types of injury. (See maj. opn., *ante,* at p. 161.) However, in *Baptist Hosp. of Southeast Texas* v. *Baber, supra,* 672 S.W.2d 296, a Texas appellate court invalidated a $500,000 limit that applied only to damages other than medical expenses. Also, in *Simon* v. *St. Elizabeth Medical Center, supra,* 355 N.E.2d 903, an Ohio appellate court stated in dictum that a $200,000 limit on "general" damages, similar to the limit on "noneconomic" damages involved in the present case, violated the United States and Ohio Constitutions. These provisions were not markedly more severe than MICRA's $250,000 limit on noneconomic damages.

---

[2]The majority attempt to distinguish *Carson* on the grounds that the New Hampshire Supreme Court applied an "intermediate" form of equal protection scrutiny, which is not appropriate under the California Constitution. (See maj. opn., *ante,* at p. 161, fn. 19.) However, the *Carson* court's conclusion that it was "unreasonable" to require the most severely injured victims of medical negligence to support the medical care industry is no less relevant under a lower form of scrutiny. The *Carson* court found no rational basis for the fixed limit.

Moreover, for many plaintiffs the present limit may be no less harsh than the $500,000 limit on total damages struck down by the Illinois Supreme Court in *Wright* v. *Central Du Page Hospital Association, supra,* 347 N.E.2d at page 741. Depending on the relative size of a particular plaintiff's economic and noneconomic damages, the present limit might produce more or less harsh results than the Illinois statute. Only the North Dakota and Ohio statutes imposed substantially more stringent restrictions. (See *Arneson* v. *Olson, supra,* 270 N.W.2d at p. 135 [$300,000 limit on total damages]; *Jones* v. *State Board of Medicine, supra,* 555 P.2d at p. 410 [$150,000 limit on total damages].)

The burden on medical malpractice victims is no less real by virtue of the fact that it is "noneconomic" injury which goes uncompensated. Noneconomic injuries include not only physical pain and loss of enjoyment, but also "fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." (*Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893 [103 Cal.Rptr. 856, 500 P.2d 880].)

For a child who has been paralyzed from the neck down, the only compensation for a lifetime without play comes from noneconomic damages. Similarly, a person who has been hideously disfigured receives only noneconomic damages to ameliorate the resulting humiliation and embarassment.

Pain and suffering are afflictions shared by all human beings, regardless of economic status. For poor plaintiffs, noneconomic damages can provide the principal source of compensation for reduced lifespan or loss of physical capacity. Unlike the attorney in the present case, these plaintiffs may be unable to prove substantial loss of future earnings or other economic damages.

At first blush, $250,000 sounds like a considerable sum to allow for noneconomic damages. However, as amici California Hospital Association and California Medical Association candidly admit, most large recoveries come in cases involving permanent damage to infants or to young, previously healthy adults. Spread out over the expected lifetime of a young person, $250,000 shrinks to insignificance. Injured infants are prohibited from recovering more than three or four thousand dollars per year, no matter how excruciating their pain, how truncated their lifespans, or how grotesque their disfigurement. Even this small figure will gradually decline as inflation erodes the real value of the allowable compensation.

The majority are able to cite only a single decision upholding a limit on medical malpractice damages.[3] In *Johnson* v. *St. Vincent Hospital, Inc., supra,* 404 N.E.2d 585, 601, the Indiana Supreme Court upheld a $500,000 limit on total damages. However, the Indiana statute did more than restrict malpractice victims' recoveries. In order to obtain the benefits of the limit, health care providers were required to contribute to a state-run compensation fund. (*Id.,* at p. 601; Ind. Code, tit. 16, art. 9.5, ch. 2-1.)

By contrast, the present limit is not linked to any public benefit. Insurers and health care providers are free to retain any savings for private use. Moreover, the Legislature had before it *no* evidence that the immense sacrifices of victims would result in appreciable savings to the insurance companies. In the years preceding the enactment of MICRA, an insignificant number of individuals (at maximum, 14 in a single year) received compensation of over $250,000 in noneconomic and economic damages *combined.* (See Cal. Auditor General, The Medical Malpractice Insurance Crisis in California (1975) p. 31 [hereafter *Report of the Auditor General*].) Further, it does not appear that the Legislature had access to any data specifically relating to noneconomic damages. (*Id.,* at pp. 30-31; see generally, *California's MICRA, supra,* at p. 951.)

As in *American Bank* and *Roa,* this court is urged to apply a heightened level of equal protection scrutiny. (Cf. *Carson* v. *Maurer, supra,* 424 A.2d 825.) However, I do not find it necessary to address that issue, since the limit cannot survive any " 'serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals.' " (*Cooper* v. *Bray* (1978) 21 Cal.3d 841, 848 [148 Cal.Rptr. 148, 582 P.2d 604], quoting *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254].)

Only one legitimate purpose is advanced in support of the statute: that of preserving medical malpractice insurance so that plaintiffs will be able to collect on the unrestricted portions of their judgments. (Maj. opn., *ante,* at p. 158.) Admittedly, the objective of preserving insurance is legitimate. And, the Legislature might reasonably have determined that special relief

---

[3]The majority erroneously cite a second case, *Prendergast* v. *Nelson* (1977) 199 Neb. 97 [256 N.W.2d 657], as upholding a damage limit. In *Prendergast* a three-justice *plurality* of the Nebraska Supreme Court expressed their view that a $500,000 limit on damages should be upheld. (*Id.,* at p. 669.) An equal number contended that the limit was unconstitutional. (*Id.,* at pp. 675-677 (conc. & dis. opn. of White, J.), (dis. opn. of McCown, J.), (dis. opn. of Boslaugh, J.).) The seventh justice expressed no opinion on the merits of the constitutional challenge, but dissented from the result and pointed out that the plurality opinion did not decide the constitutional questions. (*Ibid.* (dis. opn. of Clinton, J.).)

In short, four out of seven justices concluded either that the limit was unconstitutional or that the question of its constitutionality was not justiciable.

to medical tortfeasors and their insurance companies would effectuate that purpose. (See *American Bank, supra,* 36 Cal.3d at p. 372.)

However, it is not enough that the statute as a whole might tend to serve the asserted purpose. Each statutory classification " ' "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." ' " (*Brown* v. *Merlo* (1973) 8 Cal.3d 855, 861 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505]; see also *Cooper* v. *Bray, supra,* 21 Cal.3d at p. 848; *Newland* v. *Board of Governors, supra,* 19 Cal.3d at p. 711.)

There is no logically supportable reason why the most severely injured malpractice victims should be singled out to pay for special relief to medical tortfeasors and their insurers. The idea of preserving insurance by imposing huge sacrifices on a few victims is logically perverse. Insurance is a device for spreading risks and costs among large numbers of people so that no one person is crushed by misfortune. (See generally, Keeton, Basic Insurance Law (1960) p. 484.) In a strange reversal of this principle, the statute concentrates the costs of the worst injuries on a few individuals.

The result is a fundamentally arbitrary classification. Under the statute, a person who suffers a severe injury—for example loss of limbs or eyesight— late in life may receive up to $250,000 for the resulting loss of enjoyment during his or her final years. An infant with identical injuries is limited to the same compensation for an entire lifetime of blindness or immobility.

Such arbitrary treatment cannot be justified with reference to the purpose of the statute. Without speculating on the wisdom of the possible alternatives, it is plain that the Legislature could have provided special relief to health care providers and insurers without imposing these crushing burdens on a few arbitrarily selected victims. Most obviously, the burden could have been spread among all of the statute's beneficiaries—health care consumers or, more broadly, the taxpayers. Alternately, the Legislature could have reduced all noneconomic damage awards in medical malpractice actions by a pro rata amount. (See *California's MICRA, supra,* 52 So.Cal.L.Rev. at p. 952.)

The majority suggest three rationales for singling out the most severely injured plaintiffs to bear the burden. First, it is suggested that "[t]he Legislature could reasonably have determined that an across-the-board limit would provide a more stable base on which to calculate insurance rates." (Maj. opn., *ante,* at p. 163.) However, the same could be said of *any* restriction on recoveries, regardless of the existence or nature of classifica-

tions among tort victims. In effect, this rationale ignores the fact that plaintiff is challenging a classification among tort victims.

Next, the majority hypothesize that "the Legislature may have felt that the fixed $250,000 limit would promote settlements by eliminating 'the unknown possibility of phenomenal awards for pain and suffering that can make litigation worth the gamble.'" (Maj. opn., *ante*, at p. 163.) Again, *any* restriction on recoveries might make plaintiffs less willing to face the risk of litigation. Like the "stability" rationale, this theory fails to address the nature of the classifications among plaintiffs.

Finally, it is suggested that "the Legislature simply may have felt that it was fairer to malpractice plaintiffs in general to reduce only the very large noneconomic damage awards, rather than to diminish the more modest recoveries for pain and suffering and the like in the great bulk of cases." (Maj. opn., *ante,* at p. 163.) The notion that the Legislature might have concentrated the burden of medical malpractice on the most severely injured victims out of considerations of fairness certainly has the advantage of originality.

While many courts have concluded that fixed malpractice damage limits are grossly unfair (see cases cited *ante,* at p. 169), none has suggested the possibility of fairness as a legitimate basis for such a limit. If "fairness" can justify the present limit, it is hard to imagine a statute that could be invalidated under the majority's version of equal protection scrutiny.

The majority's acceptance of rationales so broad and speculative that they could justify virtually any enactment calls attention to the implications of the MICRA cases for equal protection doctrine in this state. In *American Bank, supra,* 36 Cal.3d at page 398 (dis. opn. of Bird, C. J.), I joined a majority of this court in rejecting the notion of "intermediate" equal protection scrutiny. However, I conditioned that rejection on the belief— grounded in the past practice of this court—that the alternative was a two-tier system with a meaningful level of scrutiny under the lower tier. (*Id.,* at pp. 398-401; see also *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 607-610 [150 Cal.Rptr. 435, 586 P.2d 916] (conc. opn. of Bird, C. J.).)

In particular, I relied on *Brown* v. *Merlo, supra,* 8 Cal.3d 855. In *Brown,* this court conducted a serious and sensitive inquiry into the nature and purposes of the automobile guest statute. The court demanded not only that the enactment might tend to serve some conceivable legislative purpose, but also that each classification bear a fair and substantial relationship to a legitimate purpose. (*Id.,* at p. 861.) The guest statute failed to pass this level of scrutiny since the classification of all automobile guests bore an insuffi-

ciently precise relation to the asserted purposes. For example, the classification was held to be overinclusive with regard to the purpose of preventing collusive suits. (*Id.,* at p. 877.) *Brown* was subsequently followed in *Cooper* v. *Bray, supra,* 21 Cal.3d 841.

If applied in the present case, the mode of analysis used in *Brown* and *Cooper* would compel invalidation of the $250,000 limit, which is *grossly* underinclusive by any standard. Millions of healthcare consumers stand to gain from whatever savings the limit produces. Yet, the entire burden of paying for this benefit is concentrated on a handful of badly injured victims—fewer than 15 in the year MICRA was enacted. (See *Report of the Auditor General, supra,* at p. 31.) Although the Legislature normally enjoys wide latitude in distributing the burdens of personal injuries, the singling out of such a minuscule and vulnerable group violates even the most undemanding standard of underinclusiveness.

However, the MICRA majority opinions have made no attempt to assess the over- or under-inclusiveness of the legislative classifications at issue. *American Bank, Barme,* and *Roa* could arguably be distinguished from *Brown* and *Cooper* on the ground that the MICRA provisions at issue did not directly deny malpractice victims compensation for negligently inflicted harm. However, if *Brown* and *Cooper* retain any vitality today, their analysis must be applied in the present case.

At a bare minimum the court should honestly confront the existence of *Brown* and *Cooper.* In my view, it is remarkable that neither of these decisions—previously considered to be leading opinions on the application of equal protection analysis in the personal injury area—is capable of being distinguished in any MICRA majority opinion.

In conclusion, there is no rational basis for singling out the most severely injured victims of medical negligence to pay for special relief to health care providers and their insurers. Hence, the $250,000 limit on noneconomic damages cannot withstand any meaningful level of judicial scrutiny.

## II.

Plaintiff also challenges section 3333.1, which deprives medical malpractice victims of the benefits of the longstanding collateral source rule.[4]

The collateral source rule bars the deduction of collateral compensation, such as insurance benefits, from a tort victim's damage award. (See *Hrnjak*

---

[4]For the relevant text of section 3333.1, see the majority opinion, *ante,* at page 164, footnote 20.

v. *Graymar, Inc.* (1971) 4 Cal.3d 725, 729 [484 P.2d 599, 47 A.L.R.3d 224]; see generally, Schwartz, *The Collateral-Source Rule* (1961) 41 B.U. L.Rev. 348, 354.) The effect of the rule is to prevent tortfeasors and their insurers from reaping the benefits of collateral source funds, which "are usually created through the prudence and foresight of persons other than the tortfeasor, frequently including the injured person himself." (*Gypsum Carrier, Inc.* v. *Handelsman* (9th Cir. 1962) 307 F.2d 525, 534-535 [4 A.L.R.3d 517].)

As this court has observed, the collateral source rule embodies "the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift. The tortfeasor should not garner the benefits of his victim's providence." (*Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 9-10 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398] [hereafter *Helfend*].) In the present case, the plaintiff collected workers' compensation, which he earned indirectly from his employment.

It is not disputed that section 3333.1 must be reviewed under the rational relationship test. That test requires that legislative classifications bear a rational relationship to a legitimate state purpose to pass constitutional muster. (See *Brown* v. *Merlo, supra,* 8 Cal.3d at p. 882; *Cooper* v. *Bray, supra,* 21 Cal.3d at p. 848.)

The proponents of section 3333.1 have suggested that it serves two purposes. First, it seeks to eliminate double recoveries by victims. (See Keene, *California's Medical Malpractice Crisis,* in A Legislator's Guide to the Medical Malpractice Issue (Warren & Merritt edits. 1976) p. 31.) However, there is no apparent reason why legislation enacted for this purpose should be limited to medical malpractice victims. (See *Graley* v. *Satayatham* (1976) 74 Ohio Ops.2d 316 [343 N.E.2d 832, 836-838].)

Moreover, as this court has recognized, the collateral source rule "does not actually render 'double recovery' for the plaintiff." (*Helfend, supra,* 2 Cal.3d at p. 12.) Tort victims are not fully compensated for their injuries by their judgments alone. The jury is directed to award damages only in the amount of the plaintiff's injuries. Yet, plaintiffs must pay attorney fees and costs out of their recoveries. Generally, fees and costs account for a substantial proportion of the recovery in medical malpractice actions. (See U.S. Dept. of Health, Ed. & Welf., Rep. of Sect.'s Com. on Medical Malpractice (1973) p. 32.)

The collateral source rule enables the plaintiff to recover some of these costs from collateral sources. Hence, the rule "will not usually give him

'double recovery,' but partially provides a somewhat closer approximation to full compensation for his injuries." (*Helfend, supra,* 2 Cal.3d at p. 13.) Section 3333.1 will prevent many tort victims from obtaining this relatively full compensation simply because they were injured by a doctor instead of some nonmedical tortfeasor.

Furthermore, while supposedly eliminating victims' "windfalls," section 3333.1 provides a windfall to negligent tortfeasors. Under section 3333.1, negligent healthcare providers obtain a special exemption from the general rule that negligent tortfeasors must fully compensate their victims. "No reason in law, equity or good conscience can be advanced why a wrongdoer should benefit from part payment from a collateral source. . . . If there must be a windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer . . . ." (*Grayson* v. *Williams* (10th Cir. 1958) 256 F.2d 61, 65; see also *Helfend, supra,* 2 Cal.3d at p. 10.)

The second purpose advanced to justify section 3333.1 is that of reducing the cost of medical malpractice insurance, the overall goal of MICRA. (See Stats. 1975, Second Ex. Sess. 1975-1976, ch. 2, § 12.5, p. 4007.) It is argued that the Legislature rationally singled out medical malpractice actions in order to alleviate a "crisis" in medical malpractice insurance rates.

However, the relationship between section 3333.1 and the reduction of malpractice insurance premiums is entirely speculative. There is no requirement that physicians' insurers pass on their savings in the form of lowered premiums. Hence, insurance companies may simply retain their windfall for private purposes. Further, section 3333.1 operates only as a rule of evidence. Juries may choose not to offset collateral compensation. Hence, "a degree of arbitrariness may frustrate the relationship between this provision and attainment of MICRA's goal." (*California's MICRA, supra,* 52 So.Cal. L.Rev. at p. 949.)

The courts of other jurisdictions have had occasion to address the constitutionality of similar provisions. In *Arneson* v. *Olson, supra,* 270 N.W.2d 125, 137, the North Dakota Supreme Court unanimously invalidated a statute that effectively abolished the collateral source rule in medical malpractice cases. The court found that there was no " 'close correspondence between [the] statutory classification and [the] legislative goals' " (*Id.,* at pp. 133, 137), and noted that the provision gave the tortfeasor "the benefit of insurance privately purchased by or for the tort victim . . . ." (*Id.,* at p. 128.)

Similarly, in *Carson* v. *Maurer, supra,* 424 A.2d at pages 835-836, the New Hampshire Supreme Court unanimously overturned a kindred provi-

sion, reasoning that it "arbitrarily and unreasonably discriminate[d] in favor of the class of health care providers." And, in *Graley* v. *Satayatham, supra,* 343 N.E.2d at page 836, the court struck down a requirement that collateral benefits be listed in medical malpractice complaints, reasoning that it unconstitutionally discriminated against medical malpractice victims.

Some jurisdictions have upheld similar provisions. (See *Eastin* v. *Broomfield* (1977) 116 Ariz. 576 [570 P.2d 744, 751-753]; *Pinillos* v. *Cedars of Lebanon Hospital Corp.* (Fla. 1981) 403 So.2d 365, 367-368; *Rudolph* v. *Iowa Methodist Medical Ctr.* (Iowa 1980) 293 N.W.2d 550, 552-560.) Two of these decisions were made by sharply divided courts. (See *Pinillos, supra,* 403 So.2d at pp. 369-371 (dis. opn. of Sundberg, C. J.); *Rudolph, supra,* 293 N.W.2d at pp. 561-568 (dis. opn. of Reynoldson, C. J.).) Moreover, the decisions reflect a highly deferential approach that is not consistent with the California courts' rigorous application of the rational relationship test to classifications affecting tort victims. (See, e.g., *Brown* v. *Merlo, supra,* 8 Cal.3d 855; *Cooper* v. *Bray, supra,* 21 Cal.3d 841; *Monroe* v. *Monroe* (1979) 90 Cal.App.3d 388 [153 Cal.Rptr. 384]; *Ayer* v. *Boyle* (1974) 37 Cal.App.3d 822 [112 Cal.Rptr. 636].)

In conclusion, section 3333.1 permits negligent healthcare providers and their insurers to reap the benefits of their victims' foresight in obtaining insurance. This departure from the general rule prohibiting the deduction of collateral source benefits from a judgment is not rationally related to any legitimate state purpose. Hence, section 3333.1 should be declared unconstitutional.

Woods, J.,* concurred.

**MOSK, J.**—I dissent.

The well-reasoned dissent of the Chief Justice reaches a conclusion consistent with the duty of a democratic society to protect malpractice victims and to refrain from creating specially favored economic insulation for those who commit malpractice.

I part company with the Chief Justice only in regard to the equal protection test employed. The case before us is a paradigm demonstrating the impracticality of either the strict scrutiny or the rational relationship test. My colleagues persist in denying the existence of an intermediate test, and cling to the inflexible two-tier rule with a tenacity that suggests it originated with the Delphic oracle. Yet an intermediate test of equal protection has

---

*Assigned by the Chairperson of the Judicial Council.

received frequent approval from many reputable sources. (See the numerous authorities cited in my separate opinion in *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 595-603 [150 Cal.Rptr. 435, 586 P.2d 916].)

Now an intermediate test has been adopted by the Supreme Court of New Hampshire in one of the most persuasive opinions in the country invalidating legislative provisions comparable to MICRA in California. In *Carson* v. *Maurer* (1980) 120 N.H. 925 [424 A.2d 825, 831, 12 A.L.R.4th 1], the court held that in determining the validity of MICRA-type legislation, "the test is whether the challenged classifications are reasonable and have a fair and substantial relation to the object of the legislation. [Citations.] Whether the malpractice statute can be justified as a reasonable measure in furtherance of the public interest depends upon whether the restriction of private rights sought to be imposed is not so serious that it outweighs the benefits sought to be conferred upon the general public."

The Supreme Court of New Hampshire concluded that the act "arbitrarily and unreasonably discriminates in favor of the class of health care providers. Although the statute may promote the legislative objective of containing health care costs, the potential cost to the general public and the actual cost to many medical malpractice plaintiffs is simply too high." (*Id.* at p. 836.)

Once again we have an opportunity to employ a test carefully crafted to avoid the rigid extremes of the anachronistic two-tier test of equal protection. As I wrote in *Hawkins, supra,* 22 Cal.3d at page 595, "the ultimate acceptance of an intermediate test is foreordained in Supreme Court opinions: the question is not whether, but when, the third test will become standard. I regret that our court has failed to forthrightly assume leadership among the states on this important question of constitutional law."

The petition of plaintiff and appellant for a rehearing was denied April 4, 1985. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.